**CADENHEAD v. CADENHEAD.**

No. 21918.

Kansas City Court of Appeals.

Missouri.

March 1, 1954.

427

Jarrett & Simms, Kansas City, for appellant.

Irving Achtenberg, Kansas City, for respondent.

BOUR, Commissioner.

Plaintiff, Dolores Yvonne Cadenhead, brought suit against her husband, Robert Walton Cadenhead, III, in the Circuit Court of Jackson County, Missouri, at Kansas City, seeking a divorce, alimony, the custody of the parties' minor son, an allowance for the support of the child, and for attorneys' fees. Defendant filed an answer and cross-petition, praying for a divorce and custody of the child. Both parties relied upon alleged intolerable indignities as grounds for divorce. The court granted defendant a divorce, awarded the custody of the child to defendant with reasonable visitation privileges to plaintiff, allowed plaintiff the sum of $100 for attorneys' fees, and ordered that the costs of the proceedings be paid by defendant. Plaintiff has appealed.

Plaintiff and defendant were married in Tulsa, Oklahoma, August 25, 1949. One child was born of the marriage, a son, Robert, who was two years of age at the time of the hearing below. Robert was born in Tulsa. Plaintiff testified that she had been married once before, in 1944, to a Mr. Hanson, whom she divorced before her marriage to defendant, and that she had a daughter, Marsha, by her first husband. Defendant testified: "This is my only marriage. * * * She was married and divorced and remarried him and divorced him again before I married her." Marsha was five years of age at the time of the hearing and about two when her mother married defendant. Plaintiff and defendant lived together in Tulsa until December 1, 1951, when they moved to Kansas City, Missouri, with the two children, and they have resided there since that time. About July 1, 1952, plaintiff left the home of defendant and moved to an apartment in Kansas City, where she established a separate place of abode for herself and the two children. Plaintiff filed her petition for divorce on July 12, 1952; defendant filed his answer and cross-petition on August 7, 1952; and the case went to trial on August 26, 1952.

Plaintiff alleged in her petition that defendant had "a violent and abusive temper", and that "on various occasions" he struck her "while in a fit of rage, causing her to fear for her personal safety". Plaintiff testified that defendant had "a rather violent temper"; that he struck her and "when he was mad like that and lost his temper", she was afraid of him. When asked on cross-examination whether she could "be specific", she said: "Well, yes, one time when we were on a visit in Tulsa, and were at a Grotto dance, * * * he seemed to have the

idea that I was trying to flirt with some Marine there. * * * And so we started quarrelling, and he slapped me. * * * We both had been drinking. * * *

"Q. Do you recall any other occasions? A. Yes, there were two other occasions when we were living at Quality Hill Apartments (in Kansas City, Missouri). * * We had been arguing. * * * He was mad. * * * I was very angry, yes.

"Q. And did you suffer any harm from it or simply annoyed? A. No, sir.

"Q. Any physical injury as a result of any of these? A. No, sir. * * *

"Q. Were you intoxicated at that time? A. No, sir."

Defendant admitted that he slapped plaintiff on one occasion when the parties attended a dance in Tulsa, but stated that plaintiff was hysterical at the time. He said: "I slapped her with the flat of my hand, not hard enough to cause any bruises on her whatsoever. When a person is hysterical, I have found that about the only way to wake them up and bring them to their senses is a sudden shock. * * * She had been drinking that evening." Defendant's mother, who lived in Tulsa, testified that she remembered the evening in question, and continued: "My husband and I stayed at home and kept the children. * * * We were aroused from our sleep by a terrible commotion, crying and screaming, hysterics, it sounded like. * * * It was Dolores. And we heard our son trying to quiet her * * *. I finally quieted her down * * *." Defendant did not expressly deny the charge that he slapped plaintiff on two other occasions.

Plaintiff charged in her petition that defendant had exhibited a hatred of plaintiff's daughter and had punished her "by using excessive force so as to endanger her health". When plaintiff was asked on direct examination how defendant had treated her daughter, Marsha, she said: "He was very abusive and very cruel to her. * * * One specific time was in March (1952) * * *. We were coming back from a visit (in Oklahoma) * * *, and he had purchased a magazine * * *, and Marsha wanted to look at the magazine, and the little boy tried to grab it away from her and tore the cover off. So my husband picked the magazine up and rolled it and knocked the little girl in the side of the head with it, and she complained of an earache for three days after that * * *. He is just cruel to her, I mean he never has a civil word for her." On cross-examination, plaintiff testified: "Q. Did you take the child to a doctor? A. No, sir, she complained of her ear and when I mentioned taking her to a doctor, she made the statement that her ear didn't hurt. However I did consult the doctor on the telephone. * * * He told me to apply warm packs to her ear, which I did. Q. Now, are there any other occasions similar to that? A. No, sir."

One of plaintiff's witnesses was Raymond L. Jackson of Kansas City, Missouri. He testified that "over the week end of Decoration Day, they (the Cadenheads) had gone to Tulsa and I had gone down later on the train and rode back with them in their car from Tulsa. And on the return trip he did slap the little girl with a magazine or newspaper, I believe.

"Q. Slap her on the side of the head? A. Yes.

"Q. Did he hit her very hard? A. Well, she cried for several miles afterwards." Opal Phelps, a witness for plaintiff, testified that she had visited in the Cadenhead home, and that she had never observed "any difference in the attitude of Mr. Cadenhead toward the two children", while two of plaintiff's witnesses testified that defendant seemed to be partial to his son. Helen Fulton, a witness for plaintiff, testified that on one occasion, when she was visiting in the Cadenhead home, she saw defendant spank plaintiff's daughter, but there was no evidence to show that defendant acted improperly on that occasion. Plaintiff did not mention this incident in giving her testimony.

Concerning his treatment of plaintiff's daughter, defendant testified: "I had al-

ways thought a lot of Marsha before we were married, and she was kind of an unruly child in my estimation, having not had a father before. I was probably a little quicker temper than a lot of them, because I hadn't gone through it. However, most of the time when the child was to be corrected, my wife would say, 'Bob, correct Marsha', or 'Correct the child'. * * * I was the one that was doing the correcting, and if I paddled her it was hurting me in the eyes of the child. But I was doing 90 per cent of the correcting.

"Q. These occasions you refer to was that simply an occasion on which you were disciplining the child for something either the mother or you felt that that child had done that required some disciplining? A. That is right. I had never just beat the child or anything like that. I am not that type of person. * * * I have had difficulty in getting her to mind and her mother had difficulty in getting her to mind." Plaintiff admitted that on several occasions she requested defendant to correct Marsha.

Another charge in plaintiff's petition is that "defendant on many occasions has spoken of the plaintiff's mother in a degrading manner with the intent to cause the plaintiff to suffer embarrassment." Plaintiff testified: "Q. Now, did he ever make any remarks about your mother? A. Yes, sir. * * * That she is no good and a drunkard, and she is indecent. He made the statement that she has ruined my life. He at one time ordered her to stay out of our house and completely off of our premises, and never to come back, including her friends." In reply to this charge, defendant said: "Well, her mother had previously lived with us and moved away to a different apartment in Tulsa and had moved back again. And then moved to another apartment. And she had some friends that came out there that I didn't approve of and the only statement that I made was to please keep her friends away from there and that she could come to our house and see her daughter or the children at any time she saw fit and could, if she wanted to, call and I would be very happy

to leave when she came there, since she didn't particularly care to see me." He said he requested his mother-in-law not to bring her friends to his home because "most of them were drunk or drinking when they came out there".

Plaintiff also alleged in her petition that "defendant has bragged to others of his girl friends and conquests". There was no evidence to support this charge.

Defendant charged in his cross-petition that "plaintiff drinks intoxicating liquors to excess and has been frequently and habitually intoxicated"; that "on numerous occasions plaintiff has become unconscious from the effects of heavy drinking"; that "on numerous occasions, without the knowledge or consent of defendant, plaintiff has been absent from the family domicile overnight and has thereby neglected the child hereinbefore mentioned"; that "plaintiff has associated and consorted with persons of poor character and reputation"; and that "plaintiff is emotionally unstable and has attempted to commit suicide".

Defendant testified that about every four or five weeks plaintiff "would leave to go to a club meeting or go see someone for a few minutes or some sort of a party, or something"; that on such occasions she said she would be back at a reasonable hour but that she always remained away from home for several hours and on some occasions did not return until the next morning; and that "she was drunk on a great many of the occasions when she came back". Plaintiff testified: "Q. Can you tell the court whether or not you get drunk? A. No, I wouldn't say that I do. I take a sociable drink but I have never been so that I couldn't manage myself. Q. How often do you take a drink? A. Oh, maybe once a week."

In describing one incident, defendant said: "Shortly after we were married, I had gone back to Texas to finish up the business with the company I was with there * * *. I arrived in Tulsa about four o'clock in the morning. I went to the duplex in which we lived * * * and

there was no one home. * * * I thought that possibly my wife was over to my folks' house * * * and I went over there, and she wasn't there * * *. So I went back to the duplex, and as I drove in the driveway, she had driven in just before me with a young man that was the son of a lady up the street * * *. (He) jumped out of the car, ran around behind the car and ducked down. * * * And I went around and just told him he had better leave. And her explanation of the instance was that they had been out drinking beer." When plaintiff was asked on cross-examination whether she recalled this incident, she said: "No, sir." She admitted, however, that one occasion, when the parties lived in Tulsa, she played poker all night and "came in at five".

This is defendant's description of another incident that took place in Tulsa: "She (plaintiff) was out one evening with my mother-in-law and returned home to the house, and I had been worried about her. And she came in and had been drinking, and decided she would take a bath. * * * I was in the living room, and all at once I heard a thud, and I thought something happened, I jumped up and ran in, and she was unconsious and in the bath tub, laying just over the edge, her feet were out. So I picked her up and laid her on the bed, and she was about eight months along in pregnancy then. * * * I called the doctor who was taking care of her and asked him, told him about it, and he said take her pulse and call him back, and I did, and he said unless there was a change, she is probably all right. * * * When she came to, she complained that I had pushed her in the bath tub, and yet I was clear in the other room, and hadn't touched her, but that was her complaint to me, when I told her that she had fainted or passed out into the bath tub." Plaintiff testified on cross-examination: "Q. Now, going back to the period when you were pregnant with Mr. Cadenhead's son, your son, you recall an occasion on which you became intoxicated, came home and passed out in the bathroom? A. No, sir."

Plaintiff testified to several incidents that took place in 1952, while the parties were living together in Kansas City. Describing the incident in February, 1952, plaintiff testified on direct-examination: "I went to pick up a girl friend of mine (Mrs. Virginia Huntsinger), and she and I came back to the apartment. * * * We were there until about quarter after two that morning.

"Q. And then where did you go? A. We went to Sidney's on the Plaza and ate. * * * Then I took her home. * * * I went to her apartment and we sat around up there and talked for a while and I didn't call my husband, because we didn't have a telephone at that time. So when I did call him it was about five 'o'clock, and of course, he was quite perturbed with me, and it made me a little bit angry, so we then went up to the Keg on 39th and Main, and he called me up there and told me to come home. So I took the girl home and then I went home.

"Q. Were you intoxicated? A. No, sir." Plaintiff testified on cross-examination: "Didn't you return to your house about eight o'clock in the morning with Mrs. Huntsinger? A. No, sir, it was around seven. * * *

"Q. Do you recall passing out later in the morning, when you were still drinking? A. No, sir, I did not." Plaintiff said she had never "passed out from drinking".

Referring to the incident in February, 1952, defendant testified that when plaintiff left home in the evening she said "she would be back about 9:30 or 10 o'clock"; that he did not know where she was going; that she came home about 8:30 the next morning and "Virginia came with her"; that shortly thereafter he went to a sales meeting and when he returned home with Mr. Richard J. Staihr, a business associate, "this Virginia had gone"; and that plaintiff passed out or went to sleep while Mr. Staihr was there. Referring to this occasion, Mr. Staihr, a witness for defendant, testified: "We reached his home about 10:30, I would say, maybe 11 o'clock. And we walked in and Mrs. Cadenhead was

there and the two children were there * * *. I could smell liquor on her breath and she had a drink in her hand at the time. And neither one of the children were very clean at the time * * *. I just sat down and Mr. Cadenhead talked to her. And then he was going to go with me back to get the car. And he went to speak to her and asked if she would take care of the children, and she was laying with her head over the back of the chair and he couldn't rouse her. She had either passed out or gone asleep beyond arousing." He stated that plaintiff appeared to be intoxicated at the time. Mr. Staihr further testified that he was employed by the Mid-States Supply Co., in Kansas City, Missouri; that defendant was employed as a salesman by the same company; and that he had been with the Cadenheads on several other occasions when plaintiff was not intoxicated and the children were clean and well behaved.

Mrs. Charles R. Criswell testified as a witness for defendant that from December, 1951, until May, 1952, she and her husband occupied an apartment in Kansas City and that the Cadenheads lived in the same apartment building; that for a period of about two and a half months the Cadenheads did not have a telephone; and continued: "There were occasions when she would call me in the middle of the night and ask me to go down and either relay a message to Bob (defendant) or ask him to come to the telephone. * * *

"Q. Now, can you tell us something more about this incident when she called about five-thirty in the morning? A. She had called earlier that evening, well, * * * I think it was around one o'clock that night and told me, and asked me to tell Bob that she was out with a friend of hers, and had been drinking and she didn't feel that she was in a condition to drive the car home at that hour, so that she would stay there until she felt that she could drive the car. I told Bob and he asked me who she was out with, and I told him that I didn't know. Then she called again at five or five-thirty and asked me to go down and get Bob and bring him to the telephone, which I did * * *. Following her return home, I don't know the hour of her return, she sent Marsha, the daughter, down to my apartment and asked me to come down. * * * This Virginia Huntsinger, I believe her name is, was with her * * * and they were both still drinking at that time."

Plaintiff testified on direct-examination that in March, 1952, she attempted to commit suicide by taking sleeping pills; that defendant called a doctor and they took her to a hospital in Kansas City. She testified on cross-examination that she had been out that evening with Opal Phelps; that they went to a cocktail lounge where they "had three or four drinks"; that she returned home and took the sleeping pills "around twelve or twelve-thirty"; that defendant was there at the time; and that the doctor who took care of her said she "was in a nervous state and had been distressed and that drinking would not help it".

The evidence showed that plaintiff received from her former husband the sum of $50 a month for the support of her daughter, Marsha. In describing plaintiff's attempt to commit suicide, defendant said: "Well, that particular week she had learned that her ex-husband had come home from Europe and was in Kansas City, and she was perturbed that he was going to quit paying child support, which she had no facts to back that up * * *. She went out that evening with this Opal Phelps that testified earlier this morning. * * * I stayed home with the children. And she came back in and woke me up about eleven-thirty or twelve o'clock. * * * And she had been drinking and wanted to argue and discuss the situation of her ex-husband. And I wouldn't do it, tried to get her to go to bed. She went into the bathroom and came back out and threw the bottle in my lap and said, 'Well, you won't have to worry any more, I fixed that.' And I knew what the bottle was, because she had been prescribed sleeping pills by a doctor in Tulsa." Defendant further testified that he called plaintiff's doctor who told him to take her to the hospital; and that he called Mr. and Mrs. Charles R. Criswell, who lived in the

same apartment building, and "asked them to take care of the babies and help take her to the hospital", which they did. Mrs. Criswell testified that plaintiff "was staggering * * * and was loud and screaming that she hoped she didn't pull through, she hoped she died, that the only things she wanted were her children and we weren't going to take her from her children, that she wasn't going to the hospital". Mr. Criswell also testified to plaintiff's condition at that time.

Describing an incident in April, 1952, plaintiff said: "There was a White House party * * * well, it's like a Stanley Brush party, instead of brushes, it's china.

"Q. By that, do you mean some salesman goes to somebody's house and they invite in a bunch of ladies and they sell—? A. That is right." Plaintiff testified that she went to the party with Mrs. Shirley Pittman; that she left home about 7 o'clock in the evening; that defendant stayed at home with the children; that defendant knew where she was going and made no objection; that she and Mrs. Pittman left the party about 11 o'clock and went to the Flamingo Club where they "had two bottles of beer", and then went to another "place" and "had one more". Plaintiff continued:

"Q. And then did you start out in the car to go somewhere? A. I took her home.

"Q. Where did you go after that? A. I stopped in at Putsch's 210 on the Plaza. * * * I was there about twenty minutes. * * *

"Q. Then where did you go? A. I went to Olathe. * * * Well, I had been pretty distressed over the fact that my husband was not satisfied with his job and said we couldn't move back to Tulsa, because the people that were renting our house lease wasn't up (sic), so I thought possibly I would go down there and talk to them, I got as far as Olathe and thought I'd better call my husband, which I did, and he told me to come on back home, which I did. * * * It was around five o'clock."

Defendant testified that plaintiff called him from Olathe about 5 o'clock in the morning; that she was crying and he asked her what she was doing; that she said she was going home, that she had a home in Tulsa; that he told her she had a home in Kansas City with two children who were waiting for her and she had better turn the car around and come back; that she came home about an hour later; that "she wasn't drunk, she had been definitely drinking * * * but then an hour ride in a convertible is kind of cooling."

Plaintiff testified on cross-examination: "Do you recall an incident in May (1952), when you were drinking at the Plaza Bowl with a man by the name of Simpson? A. Yes, sir. * * * I had gone to a sorority meeting, had stopped to have the car filled up with gasoline, Mr. Simpson had known me since I was a baby. * * * He asked me if I would like to have a drink. * * *

"Q. And did your husband come looking for you and find you drinking in the bar at the Plaza Bowl? A. Yes, I had one drink." Referring to this incident, defendant said: "She said she would be home early and it was past the time and there was a friend of mine there that had an automobile. So I got a baby sitter and he and I went to look for her and I knew that chances are she would be at one of the lounges or bars around the Plaza, and I found her there and went in and just sat down and waited until she got through drinking beer with Mr. Simpson and talking with him, and I didn't enter into the conversation * * *. And then I took her home." Mr. Simpson was called as a witness for defendant and he testified: "Well she came by the station about 10 o'clock, I guess and she or I one said something about a beer, and we went down and had a couple of beers * * *. We were sitting there and talking about her father and her mother's brother * * *. Bob and a friend of his came in. * * * Evidently he was looking for her. * * * That is all there was to it. * * *

"Q. How long were you together? A. Oh, possibly two hours." According to Mr. Simpson, he had known plaintiff for about twenty-two years.

On another occasion, according to defendant's testimony, while the parties were living in Kansas City, they were invited to the home of Mr. and Mrs. Tucker, and accepted the invitation. Defendant testified that "there was a lot of drinking done that evening"; that after they left the Tucker home plaintiff said she wanted something to eat, and he stopped to get her a sandwich; that when he returned to the car he found that she had "passed out in the front seat"; that he drove home, carried her into the apartment and put her to bed, and "she didn't wake up until the next morning". Part of defendant's testimony could be interpreted as meaning that he drank intoxicating liquor at the Tucker home, but there was no evidence that he was intoxicated on that occasion. The plaintiff did not mention this incident.

Haskell Sobol, a witness for plaintiff, testified that he owned and operated a manufacturing plant in Kansas City, Missouri, where plaintiff was employed as a bookkeeper and stenographer from about December 1, 1951 to April, 1952; that during that period he did not "detect any liquor on her breath"; that he had never seen plaintiff when she appeared to be intoxicated or "had the appearance of having a hangover"; that while plaintiff may have been absent from work "a day or so", she was "very regular". He said plaintiff "was very efficient, she did her work very well". Margaret Crist, a witness for plaintiff, had known plaintiff about a year. She testified that prior to their separation plaintiff and defendant employed her "as a baby sitter" when they went out together in the evening, which "was usually once a week"; that the children were clean and well behaved; and that plaintiff was never intoxicated when she returned home.

The testimony of Opal Phelps, Mrs. Muriel Tucker, Mrs. Elaine Williams, Mrs. Opal Dean, Helen Fulton, Mrs. Phyllis Brown, Raymond L. Jackson, and Mrs. Shirley Pittman, witnesses for plaintiff, tended to show that during the time plaintiff and defendant lived together in Kansas City their home was well kept and that the two children were clean and well behaved.

Six of these witnesses had known plaintiff for many years; two had known her about a year; and one had lived next door to her for several months. All of them said that they had visited in plaintiff's Kansas City home. According to their testimony, they had never seen plaintiff when she appeared to be under the influence of intoxicating liquor. Opal Phelps, Mrs. Williams, and Mrs. Pittman said that plaintiff's reputation in the community for veracity and morality was good. Mrs. Pittman expressed the opinion that plaintiff "would make a proper mother and properly care for that child". Mrs. Dean testified that plaintiff was "capable of caring for these little children", and Helen Fulton was of the same opinion. Opal Phelps admitted on cross-examination that plaintiff "does drink and on quite regular occasions". When asked whether plaintiff could "hold liquor very well", she said: "Yes, I think she can hold it very well. In fact, I have never seen her have very many drinks." She further testified on cross-examination that on one occasion she and plaintiff went to a cocktail lounge where they "had two or three drinks". Later that evening plaintiff attempted to commit suicide. Mrs. Tucker said that plaintiff did drink—"just sociable drinking". The testimony of Helen Fulton was to the same effect.

Mrs. Pittman also testified that on one occasion, when she and her husband were dining at the Cadenhead home, beer was served with the meal—"we all had a can of beer while we ate"; that defendant continued to drink beer until about 1 o'clock in the morning and became intoxicated, but there were "no scenes or quarrels or fights". She further testified that she "went to the White House party" with plaintiff, and continued: "Q. She (plaintiff) finally ended up in Olathe? A. That is right. * * * "Q. What time of night did you leave her? A. About twelve, twelve-thirty." Mrs. Tucker testified that on several occasions she heard defendant make indelicate remarks "when somebody would be walking down the street, a girl".

Frank S. Verbeck, office manager for the Mid-States Supply Co., testified that

defendant had worked for that company as a salesman since December, 1951; that defendant was industrious and dependable; and that "he never came to work smelling of alcohol, never been intoxicated". Mrs. Charles R. Criswell, who lived for several months in the apartment house where plaintiff and defendant resided, testified that defendant was very helpful around the house; that he frequently washed the dishes and "did the laundry"; and that "he stayed with the children on so many occasions". According to the testimony of plaintiff, defendant often "helped with the dishes" and "helped wash the clothes", but "not always".

■ It should be stated in passing that defendant alleged in his cross-petition that "plaintiff is grossly extravagant and insists upon a standard of living which defendant's earning capacity does not justify", and that the evidence was not sufficient to sustain this charge.

As stated, plaintiff left the home of defendant in June, 1952, and took the two children with her. As to the separation, defendant testified: "I had asked her that morning when I left what she wanted brought home for dinner. She told me and I went home with it about five-thirty and walked in the house and had nothing left. She moved the furniture out (and left) a note saying she was moving someplace in town and she would call me later on in the week and tell me where. * * * At that time, I didn't have any idea where she was * * *." When plaintiff was asked why she left her husband, she said her attorney advised her to do so.

Plaintiff testified that she had not received any money from defendant since the separation except on one occasion when he gave her $2 "to get Robby a haircut". This was admitted by defendant. He said he told plaintiff that "since she had the furniture and wouldn't tell (him) what she had sold or where it was, or anything, she could continue to sell the furniture, since that is what she had done". He added that he was using his money to pay debts that had been incurred before the separation. Plaintiff

admitted that she had sold some of the furniture; and that she had had enough money for her personal needs and the support of the two children. Defendant testified on cross-examination that after the separation he went to plaintiff's apartment three times for the purpose of seeing the children; that on one occasion he arrived there about 1:30 a. m., and on another occasion about 12:30 a. m.; and that on each occasion he "had a few beers" before going to the apartment.

Plaintiff testified on cross-examination: "* * *, assuming that the court would grant you the divorce and the custody of the child or would simply grant you the custody of the child, what do you have in mind in regard to the welfare of the child, how do you plan to take care of the child, and so on? A. If the court grants me money to live on, why, I'll raise the child. I can go to work.

"Q. Now, do you plan to have someone to take care of the child? A. Yes. * * * a housekeeper that had been with us a year and a half in Tulsa.

"Q. Is she to come here? A. Yes, sir. * * *

"Q. Have you any plans for a job, have you made any arrangements? A. No, sir.

"Q. About how much would you be able to earn, * * *? A. Around $275 to $300 a month. * * * I am a bookkeeper and stenographer."

Defendant's father, mother, and little sister live together in Tulsa, Oklahoma. Defendant testified that he had secured a position as salesman for a business concern in Tulsa, at a salary of $350 a month plus a commission on all sales; that if he were awarded the custody of his son he would take the boy to Tulsa and live with him in the home of defendant's parents, where the child "could play and run and have a natural home life". He said he would be required to do "some travelling" after he moved to Tulsa, but that he would have "a certain amount of freedom" because "a salesman doesn't work fixed hours", and

that with the help of his mother he would be able to care for his son.

Defendant's mother and father were married in 1926 and have been living together in Tulsa since that time. It appears from the testimony of his mother that she is 45 years of age; that her daughter is six years of age; and that her husband owns and operates a grocery store in Tulsa. In describing their home, she said: "It has a fenced yard, it has pets, it has a playground.

"Q. You live in the back of this grocery store? A. Yes, but we have a side entrance just like a house. * * * We have two bedrooms, a large living room, a kitchen, a small room that serves as a breakfast room, and a bathroom. * * * The boy and his father can share one room upstairs and we will continue to share the downstairs room with our daughter, as we always have." She stated, in effect, that she would be happy to have defendant and his son live in her home and to help care for the little boy. On cross-examination, she testified:

"Q. Have you been hospitalized in the last four years? A. I had one period that I was in the hospital for a rest.

"Q. Because of a nervous condition? A. Yes.

"Q. And have you been under a doctor's care recently? A. Only our family doctor that we see periodically. * * * I play golf once or twice a week." Defendant testified: "My grandfather became an invalid about six or eight months before he passed on, and my mother had to take care of him constantly. * * * My grandfather passed away a little over a year ago and since that time my mother hasn't had any trouble, she has regained her health. She plays golf."

Plaintiff-appellant's first point is that the evidence does not show that defendant is the innocent party or that she offered him such indignities as would entitle him to a divorce but on the contrary clearly shows that she is the one who has suffered intolerable indignities and is the innocent and injured party.

While each divorce action based on alleged general indignities must be determined on its own facts, the courts have said repeatedly that indignities, such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The acts relied upon must amount to a species of mental cruelty, and must evidence a course of conduct by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation. Clemens v. Clemens, Mo.Sup., 235 S.W.2d 342, 346; Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554, 561; Key v. Key, Mo.App., 93 S.W.2d 256, 259.

Plaintiff testified that defendant slapped her on three occasions when they were quarrelling. Defendant admitted that he slapped her on one occasion. He said she had been drinking and was hysterical at the time and he slapped her to bring her to her senses. This part of his testimony was corroborated to a certain extent by the testimony of his mother. Plaintiff denied that she was hysterical on that occasion and said both of them had been drinking. Defendant admitted that he spanked Marsha on occasions and did not deny that on one occasion he struck her on the ear with a magazine. He did not deny that he made the indelicate remarks attributed to him by Mrs. Tucker and there was no denial of Mrs. Pittman's testimony that on one occasion he drank beer until 1 o'clock in the morning and became intoxicated. Plaintiff did not testify that defendant drank intoxicating beverages to excess and her petition contains no such charge. However inexcusable was defendant's conduct on the occasions mentioned, the acts and words complained of were not of such character and frequency as to constitute a course of conduct on the part of defendant which would be subversive of the family relation and make plaintiff's condition intolerable. Moreover, we are not convinced that defendant intentionally mistreated plaintiff's daughter. Defendant testified that he spanked Marsha only when she was in need

of discipline; that plaintiff often requested him to discipline Marsha for some offense she had committed; and that he "never just beat the child or anything like that". Since plaintiff admitted that on several occasions she requested defendant to correct Marsha, and since plaintiff's own testimony shows that she left Marsha in the care of defendant when she went out in the evening, it is difficult to believe that defendant was "very abusive and very cruel" in his treatment of the child, as plaintiff testified. The charge that defendant mistreated plaintiff's mother and made derogatory remarks about her was the subject of conflicting testimony. The trial court evidently resolved the question presented by this conflicting evidence in favor of defendant. As stated, there was no evidence to support plaintiff's charge that "defendant has bragged to others of his girl friends and conquests". Our conclusion of this branch of the case is that plaintiff did not make out a case for divorce on the ground of indignities within the meaning of the statute.

The evidence relating to plaintiff's conduct has been set forth rather fully and it is unnecessary to repeat it here. If defendant's evidence be accepted as true, he was entitled to a decree of divorce. It disclosed a course of conduct on plaintiff's part extending over a period of at least two years and of such character as to be subversive of the family relation. There are, however, some conflicts in the testimony which cannot be reconciled. Defendant's testimony was corroborated in some respects by the testimony of several witnesses and his case was aided by the admissions of plaintiff in her testimony. In some respects plaintiff's testimony was corroborated by a number of witnesses, most of whom were old friends of plaintiff. Defendant's testimony was consistent. Plaintiff's testimony, however, was at times inconsistent, and her explanations were unsatisfactory. For instance, her attempt to explain what might be termed the "Olathe incident".

■ It is our duty, of course, to review the whole record and reach our own conclusions in divorce cases, but where, as here, there are irreconcilable conflicts in the testimony and the decision depends largely upon the credibility of the witnesses, we must give due deference to the conclusions of the trial judge who saw and heard all of the witnesses, and we are not authorized to set aside the judgment unless clearly erroneous. Section 510.310, subd. 4, RSMo 1949, V.A.M.S. With this rule in mind, we have concluded that the defendant has, by a preponderance of the credible evidence, established facts which show that he was the innocent and injured party and therefore entitled to a decree of divorce. While defendant's conduct was not exemplary at all times, that will not prevent him from being an innocent party unless his misconduct was such as to entitle plaintiff to a divorce had she been free from blame, Simon v. Simon, Mo.Sup., 248 S.W.2d 560, 563; Pipkin v. Pipkin, Mo.App., 255 S.W. 2d 66, 68, which the trial court held was not the situation and, as stated above, we concur in that view.

■ Plaintiff's next point is that the court erred in awarding the custody of the parties' minor son to defendant. It is urged that the best interests of a child of tender years requires that it be placed in the custody of its mother. Ordinarily, as between the father and mother of such a child, the custody of the child will be awarded to the mother unless it is shown that she is unfit to take charge of the child or that she cannot provide it with a suitable home. As stated in Tuter v. Tuter, Mo.App., 120 S.W. 2d 203, 205: "* * * all things being equal, no child should be deprived of that maternal influence unless it be shown there are special or extraordinary reasons for so doing." Plaintiff also insists that the court erred in awarding the custody of the child to defendant, because "the father was to remove the child from the jurisdiction of the court". In Fago v. Fago, Mo.App., 250 S.W.2d 837, 841, the court said: "While generally speaking it is against the policy of the law to permit the removal of a minor child to another jurisdiction, the obstacle

of non-residence is not an insuperable one and where it is clearly made to appear that the best interests of the child will thereby be subserved, the removal of a child will be permitted", citing cases. Plaintiff further contends that there was "no evidence or proof that the plaintiff is incompetent or unable to rear" the child; that defendant is not a fit person to have the custody of his son, because the evidence concerning his conduct after the separation shows "a flagrant disregard for the welfare and well being of his child"; and that the evidence shows that defendant's mother "was in ill health, has some kind of nervous disorder, and would be wholly unfit" to care for the child.

▆▆▆ It is well settled that "the findings of the trial court in matters involving the custody of a minor child of divorced parents, while not binding upon the appellate court which must review the record for itself, are nevertheless not to be lightly disturbed, and will be deferred to unless the appellate court is firmly convinced that the welfare of the child requires some other disposition." Lutker v. Lutker, Mo.App., 230 S.W.2d 177, 179. The parties to this litigation are familiar with their respective claims to the custody of their son, and are conversant with the evidence and the reasons which prompted the trial court to award custody to defendant. Consequently, it would serve no useful purpose to restate and analyze the evidence relating to the issue of custody. It is sufficient to say that the evidence regarding the personal fitness of the parents and their respective situations strongly supports the award made by the trial court. The record discloses no basis for appellate interference with that award. We defer to the conclusion reached by the trial court.

▆▆▆ Plaintiff's last point is that the allowance of $100 for attorneys' fees is inadequate. The fixing of the amount of such an allowance to the wife in a divorce case is a matter resting largely in the trial court's discretion which is to be exercised in the light of the wife's necessities and the husband's ability to pay. Padgett v. Padgett, Mo.App., 231 S.W.2d 207, 211. While the amount allowed in this case is small, we do not feel justified, under the record before us, in holding that the allowance is so inadequate as to show abuse of discretion. The point is ruled against plaintiff.

For the reasons stated, the judgment should be affirmed, and the commissioner so recommends.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed.

All concur.