Thomas SPENCER, Plaintiff-Respondent,

v.

Marylou R. SPENCER, Defendant-Appellant.

No. 8282.

Springfield Court of Appeals.

Missouri.

Sept. 22, 1964.

Byron Kearby, Poplar Bluff, for defendant-appellant.

J. Lee Purcell, Hyde, Purcell & Wilhoit, Poplar Bluff, for plaintiff-respondent.

HOGAN, Judge.

This is a divorce action. In his petition, the plaintiff sought a divorce upon the basis of general indignities, but conceded custody of the parties' minor child to the defendant and tendered his willingness to continue supporting the child if a divorce was granted. In her answer and cross bill, the defendant set up certain matters in recrimination, and also set out certain indignities as grounds for divorce from the plaintiff. In addition, the defendant asked for custody of the child, reasonable support for the child, attorney's fees, and $10,000.00 alimony in gross. After hearing evidence, the trial court has found the plaintiff to be an innocent and injured party and has granted him a divorce. The defendant has been granted custody of the minor child, and plaintiff has been ordered to pay the sum of $100.00 per month as child support. No award of alimony was made. The defendant has appealed, contending generally that the plaintiff has not shown himself to be an innocent and injured party, but that she has, and that the trial court should have granted her the divorce and should have made an award of alimony in gross.

The record on the merits is sparse, and very little appears in the evidence concerning the parties' background. On the basis of what we can glean from the proofs presented, both plaintiff and defendant appear to be well regarded in the community in which they reside. They were married June 12, 1948, and, except for a period of separation in 1953, they lived together until the middle of August 1962. They are the parents of one minor female child, ten years of age at trial time, whose custody is not in question. The plaintiff, Thomas Spencer, was employed by a local bank and appears to have been in charge of the installment loan department. He had been employed at the bank for more than twenty years and, it seems, was a trusted employee, charged with considerable responsibility. All that is shown about the defendant—of a general nature—is that she was 36 years of age at the time of trial, was conceded by the plaintiff to be a "good moral woman, and a proper person to have custody [of the child]." During the first "year and a half" of her marriage, Mrs. Spencer had worked for a local insurance firm, contributing her earnings toward the maintenance of her home. Each party conceded the other's good moral character.

The plaintiff's evidence is centered around one episode which, we take it, occurred a short time before the parties finally separated. Concisely put, Mr. Spencer testified that Mrs. Spencer, having told him that she no longer cared for him and no longer desired to live with him, locked him out of the house in which they resided. On seven different occasions, Mr. Spencer testified, at times ranging from 8:00 P.M. to midnight, he was locked out of his residence. That, together with the statement that he was "treated coldly and indifferently, and the marriage lacked the warmth that

you would expect out of the marriage," represents the sum and substance of the plaintiff's testimony. His whole case, we may add, consisted of his own testimony.

Certain other facts may be inferred from the defendant's testimony, though we must in frankness say her evidence was likewise concise to the point of being cryptic. Drawing such inferences as we think we reasonably may, however, we conclude from Mrs. Spencer's testimony that the parties had been separated for a period of about eight months in 1953, and that at the end of that time they became reconciled—Mr. Spencer gave the date as Thanksgiving 1953—and built a home of their own in Poplar Bluff. Since the reconciliation, the defendant stated, the plaintiff had "treated me more or less like he would a housekeeper. He would come in when he wanted to and he would leave when he wanted to. * * * Most of the time when he talked to me, it was to cuss me out or bawl me out, and if I tried to talk to him he would say, quit your bitching, or he would slam the door and walk out." The defendant's evidence was that Mr. Spencer was very niggardly with her; although he made a salary of $150.00 to $200.00 per week, or at least she "figured that," he allowed her only $30.00 per week for such necessary items as groceries and clothing, and occasionally, "usually at Christmas time," Mr. Spencer would give her "twenty-five or fifty dollars." Because of his irregular habits, and his lack of physical attention, Mrs. Spencer believed her husband had been associating with other women.

Though, as we have indicated, the real source of the parties' difficulties is veiled, upon the record presented, at least a part of their difficulty seems to have arisen when they moved into a home constructed for them by Mrs. Spencer's mother, Mrs. Reece. We take it from the record that some three years before the parties were finally separated the defendant's parents came to pay a short visit with Mr. and Mrs. Spencer. Mr. Reece was then ill and, a short time thereafter, died. "By mutual agreement,"

Mrs. Reece came to live with her daughter and son-in-law. Some time after that, again "by mutual agreement," Mrs. Reece constructed a more elaborate home, with the understanding that she would retain title to the home and pay the taxes, and Mr. Spencer would pay the utilities. Mrs. Reece was provided with separate quarters. Mrs. Spencer and Mrs. Reece "worked together" in running the house, and they "consulted Tom [Mr. Spencer] about it at times."

After they moved into this new house, according to Mrs. Spencer, her husband's irregular habits, incivility and lack of affection began to affect her health adversely. On several occasions, she found lipstick on her husband's shirt collars and "because of his sex life at home," she believed "he would have to be out with someone else." Mrs. Reece also suspected her son-in-law and called the defendant's attention to the fact that when she did the washing she found the fly of Mr. Spencer's shorts was sometimes washed out. Both Mrs. Spencer and Mrs. Reece were upset by the plaintiff's irregular habits. Mrs. Spencer was "becoming nervous and a nervous wreck, and * * * got so [she] couldn't sleep at night, waiting for him [plaintiff] to come in. * * *" Mr. Spencer "was making a wreck" of Mrs. Reece. As a consequence, and we take it after consultation with Mrs. Reece, Mrs. Spencer informed her husband that "if he wasn't in by midnight I would put the chain on the door, so that he couldn't come in." Mrs. Spencer then "kept on [locking the door] until the week went by, and I finally decided he wasn't going to leave anyway, and so I went to talk to a lawyer about a divorce, and then he [plaintiff] moved out."

The appellant argues that the plaintiff failed to sustain his burden of proof because his evidence did not actually establish conduct on the defendant's part amounting to indignities within the meaning of the statute, and that the plaintiff has not shown himself to be an innocent and injured party. Rather, the defendant maintains the evidence establishes clearly that she is the

innocent and injured party and that she should be awarded the divorce.

■ In connection with her point that the plaintiff's proof is insufficient, the defendant contends that the plaintiff failed to show such indignities within the meaning of Section 452.010, V.A.M.S., as constitute grounds for a divorce, in that the plaintiff failed to establish a course of conduct on the defendant's part amounting to a species of mental cruelty. In a sense, it is true, the principal acts or indignities relied on by the plaintiff here did constitute but a single episode extending over a period of a week prior to the parties' final separation. It is also true that indignities such as to warrant the granting of a divorce ordinarily must amount to a continuous course of conduct, and single or occasional acts will not suffice. Moore v. Moore, Mo.App., 337 S.W.2d 781, 786–787 [2–8]; Clark v. Clark, Mo.App., 306 S.W.2d 641, 646 [3]. Even so, we reject the idea that there is a precise interval over which a course of conduct must extend to develop into indignities. The usual statement is that the acts relied on must be "of such character and frequency as to be subversive of the family relation," Moore v. Moore, supra, 337 S.W.2d at 786–787 [2–8]; Clark v. Clark, supra, 306 S.W.2d at 646; Thomas v. Thomas, Mo.App., 288 S.W.2d 689, 696 [4–6], cert. den. 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77; but in determining whether the offending party's actions have persisted over a sufficient interval to amount to a "course of conduct" so as to constitute indignities, we must bear in mind that by design, the statutory word "indignities" is indefinite, leaving each case to be determined according to its own peculiar circumstances. Hooper v. Hooper, 19 Mo. 355, 357; Clemens v. Clemens, Mo., 235 S.W.2d 342, 346.

■ In reviewing cases of this nature to determine the sufficiency of the evidence to support the judgment, we of course review the case upon both the law and the evidence, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses, but the judgment should be set aside only if it is clearly erroneous. Rule 73.01(d), V.A.M.R. We do have the duty to evaluate the evidence for ourselves, Clark v. Clark, supra, 306 S.W.2d at 646, but it is also clear that when the result depends upon the perception of nuances and the resolution of conflicts in the evidence, we must depend in large measure upon the trial court. Mitchell v. Mitchell, Mo.App., 319 S.W.2d 906, 908 [1]; White v. White, Mo.App., 290 S.W.2d 178, 180–181 [1]; Eikermann v. Eikermann, Mo.App., 283 S.W.2d 391, 394 [1, 2]. So far as the law is concerned, we find no particular series of cases in our jurisdiction dealing with exclusion of one spouse from the home as an indignity, though it has been suggested that such conduct might amount to desertion. Sutermeister v. Sutermeister, Mo.App., 209 S.W. 955, 956 [1]. Usually, the intentional and unjustified exclusion of one spouse from the home by the other is discussed as being a species of desertion, constructive desertion or abandonment. Anno., 19 A.L.R.2d 1428, 1462, Section 15; 1 Nelson, Divorce and Annulment, Section 4.14, pp. 92–98 (2d ed. 1945). While we do not mean to say that we accept the doctrine of constructive desertion or abandonment, and we do not confuse desertion with indignities as a statutory ground for divorce, we have no hesitation in saying that if one spouse excludes or locks the other out of their home without justification and with the intent to bring cohabitation to an end, such conduct is "subversive of the family relationship," Stumpf v. Stumpf, 228 Md. 350, 179 A.2d 893, 896 [2, 3]; Mackiewicz v. Mackiewicz, 109 N.J.Eq. 223, 156 A. 665; Heimovitz v. Heimovitz, 161 Pa.Super. 522, 55 A.2d 575, 576 [1–3], and, taken with other circumstances, may amount to the commission of such indignities as would warrant the granting of a divorce. Cf. Cannon v. Cannon, 17 Mo.App. 390, 393.

■ In this particular case, we consider the evidence sufficient to support a finding that the defendant was guilty of such misconduct as to warrant the granting of a

divorce to the plaintiff. While the plaintiff's evidence was very starkly and tersely presented, and his statement that the marriage "lacked the warmth that you would expect * * *" is practically lacking in probative force, Moore v. Moore, supra, 337 S.W.2d at 783 [1], still, he did testify that shortly prior to the parties' final separation the defendant told him she no longer loved him and no longer cared to live with him. The defendant then locked him out of their home for seven consecutive nights. We believe the evidence justifies the conclusion that the defendant meant to bring cohabitation to an end, because when she was asked what caused the separation, she answered, "that is when I started putting the chain on the door at midnight, and he kept on until the week went by, *and I finally decided he wasn't going to leave anyway,* and so I went to talk to a lawyer about a divorce, and then he moved out." (Emphasis supplied.) We also consider it reasonable to say that the defendant's suspicion of the plaintiff's infidelity was largely unjustified. The defendant's reason, basically, for believing her husband to be unfaithful was "because of his sex life at home. He would have had to be out with someone else." The defendant tolerated and discussed, if she did not participate in, her mother's inspection of the plaintiff's underwear for seminal stains to determine whether her suspicion of infidelity was justified. Though the evidence does not force any such conclusion, it might be inferred, we think, that he was required to move into quarters provided for and managed by the defendant's mother, and that as far as management of his home was concerned he was only consulted "at times." Though the evidence is possibly susceptible to varying constructions, we perceive no clear error in the trial court's conclusion that the plaintiff had been subjected to indignities sufficient to warrant granting a divorce.

The defendant further contends that the plaintiff has not shown himself to be an innocent and injured party, so as to be entitled to a divorce. We agree that one seeking a divorce must prove himself to be both an innocent and injured party, even though the statute pertaining to contested cases (Section 452.010, V.A.M.S.) speaks only of "the injured party." Franklin v. Franklin, 365 Mo. 442, 446, 283 S.W.2d 483, 485–486 [6–8]; Simon v. Simon, Mo., 248 S.W.2d 560, 562 [1]; Hoffman v. Hoffman, 43 Mo. 547, 549. However, this does not mean that the prevailing party must prove freedom from all fault; rather, he is only required to show, that in the circumstances of the case, he himself has not been guilty of misconduct constituting a ground or grounds for divorce. Simon v. Simon, supra, 248 S.W.2d at 563 [2, 3]; Langshaw v. Langshaw, Mo.App., 331 S.W.2d 15, 18 [2]. The record is susceptible to the construction that while the plaintiff was at times incivil, inattentive and irregular in his habits, he nevertheless was industrious and a good provider. The trial court apparently considered, and we consider, that the defendant's recriminatory accusations against him were unconvincing, and again we perceive no clear error in the conclusion that he is the innocent and injured party.

The defendant, as a final point, contends that an award of alimony in gross in the sum of $10,000.00 should have been made to her. A great deal of the record, as a matter of fact, is taken up by evidence relating to the plaintiff's financial condition. In sum, the record evidence indicates that at the time of trial he was employed at a salary of $650.00 per month, of which $483.36 was "take-home" pay. He had assets, mostly jointly owned with the defendant, of $19,646.32, and liabilities of approximately $9,410.01. We may say, parenthetically, that the plaintiff tendered his willingness to divide his net assets with the defendant. He also tendered his willingness to continue supporting his minor child, and has been ordered to do so.

However that may be, the defendant's point, in the circumstances of the case, is not well taken. The term "alimony," properly and strictly speaking,

means an allowance made by the court to the divorced wife herself, Marley v. Marley, 356 Mo. 870, 874, 204 S.W.2d 261, 263–264 [2, 3]; Sisco v. Sisco, Mo.App., 339 S.W.2d 283, 285 [1], and, though the authorities are not entirely in harmony, is generally regarded as an allowance in the nature of an award of damages because of the husband's breach of the marriage contract. Smith v. Smith, 350 Mo. 104, 108–109, 164 S.W.2d 921, 923–924 [5]; Nelson v. Nelson, 282 Mo. 412, 421–422, 221 S.W. 1066, 1069. An award of alimony may not be made where the divorce was granted because of the wife's fault, Section 452.080, V.A.M.S.; Willis v. Willis, Mo.App., 274 S.W.2d 621, 629 [19, 20], and it follows that an award was properly denied here.

The judgment is affirmed.

RUARK, P. J., and STONE, J., concur.