**Helen M. KLAMBERG, Plaintiff-Respondent,**

**v.**

**Edward L. KLAMBERG, Defendant-Appellant.**

**No. 32742.**

St. Louis Court of Appeals.

Missouri.

May 21, 1968.

George J. Bude, Robert C. Jones, Ziercher, Tzinberg, Human & Michenfelder, Clayton, for appellant.

Armstrong, Teasdale, Kramer & Vaughn, William H. Webster, Richard J. Sheehan, St. Louis, for respondent.

TOWNSEND, Commissioner.

The parties to this divorce action were married in November 1963 and separated in June 1965. Plaintiff-respondent founded her petition for divorce on general indignities, enumerated as follows: (1) Defendant's failure of support, (2) plaintiff's support of defendant and her payment of their usual household expenses, (3) defendant's rude and resentful conduct toward plaintiff's friends, (4) embarrassment and humiliation of plaintiff in the presence of plaintiff's friends and relatives by sulking, pouting and refusal to participate in social events, (5) plaintiff's mental anguish and suffering caused by defendant's failure to treat her as a social equal and to provide her with normal companionship. She alleged that such acts of defendant rendered her condition intolerable and a future life with defendant impossible.

Plaintiff is in active practice as a pediatrician. Defendant has been in the building construction business and at the time of trial was employed as a carpenter.

The parties lived in a home owned by plaintiff upon which she paid the taxes during their marriage. During the period when they lived together plaintiff advanced defendant in excess of $5600, of which over $3000 remains unpaid and for which plaintiff has taken defendant's note for $3000, now in default. The advances made by plaintiff were for the purposes of paying taxes on 70 acres of St. Louis County real estate owned by defendant, bills incurred in the conduct of defendant's business, tuition payments and support for defendant's 22-year old son, child support payments to defendant's former wife for a 16-year old son, lodge and union dues, interest on loans, payments on defendant's car and other cash advances. In addition, not included in the above statement of advances, plaintiff paid for her wedding ring, paid their joint income tax obligation for 1964 and at her own cost of $3170 financed their four week trip to Europe in early 1964. She bought and paid for the groceries consumed at the home, paid the telephone bills and all the expense of maintaining a housekeeper at the residence, the laundry and dry cleaning charges. She cancelled a $300 loan made to defendant as payment for his work in "doing over" a room in the residence.

Before marriage defendant expressed his belief that he would have no difficulty giving plaintiff two hundred dollars a month to run the house. "Q. Did he ever pay anything a month? A. No, sir."

The evidence on behalf of plaintiff came almost entirely from plaintiff herself. In support of her allegation that defendant was resentful and rude to her friends she stated that if they had friends in for dinner he would often leave the company and go upstairs to read or watch television without excusing himself. He became resentful of Mr. and Mrs. W, old friends, because they invited plaintiff to fill in as a guest at a lecture in place of another who became ill and for whom they had a ticket; thereafter he became disagreeable whenever plaintiff and Mrs. W followed their long practice of taking in a movie a month together. "He didn't see why I had to go out with them." Sometimes this attitude resulted in defendant's failure to talk for a day or two; sometimes he talked about plaintiff not caring for him. Upon one occasion Mr. W telephoned plaintiff at midnight that Mrs. W had collapsed. When she dressed and prepared to go to the W residence defendant was upset and didn't think that she should go, stating that "you're a pediatrician, what can you do for them?" Another couple, Mr. and Mrs. G, "were very good about inviting us to their house and to the opera. So, I think on one occasion they asked me to go [to the opera] without inviting Ed and he was very upset about this" which he manifested by sulking for a "day or so". Nevertheless defendant was afterward invited to the

home of the Gs. With another couple of long standing, Mr. and Mrs. H, their social intercourse became less and less frequent because matters got to the point that with them defendant talked less and less; plaintiff then got into the habit of going to the friends' home in the afternoon rather than having them into her home in order to stop an unpleasant situation.

"Q. Did Mr. Klamberg ever state to you that you should disassociate yourself from the people who were your friends?

A. He didn't say in so many words but it was becoming that we weren't seeing them. He didn't really like my friends and he would sulk. He didn't like to join things. He didn't want to do anything and I would have to make explanations to them."

Visits of plaintiff's daughter and son-in-law were frequent at first; if after-dinner games were indulged in, defendant in a short time would leave without excusing himself and go upstairs. Defendant was not interested in discussions about her grandchildren with plaintiff's daughter and the daughter's in-laws. He resented plaintiff's baby-sitting for her daughter and son-in-law. He protested plaintiff's remaining overnight to care for an infant grandson while the daughter was being delivered of her second child.

"Q. Did Mr. Klamberg approve of her [the daughter]?

A. Well, he did at first and then he began to say that I did everything just for Margaret and that I did too much for Margaret."

Plaintiff stated that "in the fall and winter of '63, there were many days when he [defendant] didn't go to work and when I suggested that maybe he could get a different job in the construction business and go to work for somebody else this wasn't acceptable. However after he left the house in the summer of '65 he went to work for a construction firm and worked ever since."

On the first wedding anniversary defendant told plaintiff to buy herself a suit as an anniversary gift. Plaintiff did so, but defendant thereafter told her that he was short of money and "I paid him back for the suit. The only other thing he bought me was an electric razor for the first Christmas." The parties went out to dinner one night a week; before marriage defendant paid for the dinners, after marriage plaintiff paid for them.

When plaintiff was called at home on behalf of patients defendant questioned the need for the length of the calls and when plaintiff was called to the hospital he was suspicious as to the necessity of the hospital visits. She characterized him as "an extremely jealous person"; he manifested that jealousy whenever she attended hospital staff meetings at three hospitals where she was on the staff or meetings of her professional pediatricians' society. Defendant's habit of falling asleep early at symphony concerts became so embarrassing that plaintiff gave away her season tickets and didn't subscribe the following year. "* * * if I would say anything about it then he would get upset. I thought to keep peace it was better not to go."

Plaintiff owned a farm at Warrenton managed for fourteen years by Mr. Hustudy. Defendant "was quite resentful of things that Mr. Hustudy did. And, when I would come home from the farm he insinuated that Mr. Hustudy and I were doing something wrong. Q. What would this be? A. Be seeing him too often. * * * Q. What was he suspicious of? A. Over visitors to the farm, over male visitors. I remember once when a man came to take pictures and I went with him on a tour of the farm to where he was going to take the pictures and when I came back Mr. Klamberg was very upset because I had done that * * *. He thought that I had been gone too long; that I didn't have to go with this man * * *." He was so

sulky at this time that Mr. and Mrs. H who had accompanied them to the farm kept out of his way "because he could do a good job of sulking". Mrs. H's testimony corroborated that of plaintiff concerning this incident. Mrs. H also testified that upon an occasion of the Hs' visit to the residence of the parties the defendant had left the company without explanation. "After dinner he would leave and didn't want to play cards or anything."

Defendant and his first wife hold title to seventy acres in Ellisville, St. Louis County, on which there is a five-room house and an encumbrance of $9000. "When the $9000 note came up" it was suggested that plaintiff pick it up but she declined to do so. This caused defendant to tell plaintiff that he felt that plaintiff didn't want to try to make their marriage work.

The net effect of such incompatibility according to plaintiff was that "I was pretty upset most of the time. When I got up to go to work it would be on my mind and it would be a relief to go but it got to the point where I hated to come home at night."

Plaintiff's daughter, Mrs. B, testified that after her mother's marriage to defendant she visited them once or twice a week during daytime hours and that defendant was at the house, reading or sitting around, most of the time. She also stated that when she and her husband came for dinner and stayed for part of the evening defendant would not participate in any conversation and would frequently leave the group without excuse and go upstairs —for no reason that she knew of, causing her and her husband to feel that they weren't welcome, "just weren't wanted".

Plaintiff's attitude toward defendant and his sons was developed in her own uncontradicted testimony:

"Q. And, during your marriage * * and until the date of your separation, how did you treat Mr. Klamberg?

A. With kindness and affection and tried to take care of him and cooked for him, kept the house for him and looking after his health."

In looking after defendant's health plaintiff referred him to a physician who treated him for asthma and furnished him with medication and also arranged with a dentist for the capping of defendant's teeth, in both instances as a matter of the exchange of the usual professional courtesies between medical people and which were entirely without cost to defendant.

Asked about the purpose of the European trip plaintiff responded: "Well, I was hoping by the trip to have a common background for our new association together, since we were both not in the same financial condition or in the same occupation. Then, I thought with visiting all the countries I thought there would be a basis for a mutual association and I thought this trip would be a training ground to make it better living together for us." Plaintiff volunteered to pay for the expense of the trip because "I knew by that time we couldn't go otherwise and I really wanted this to work. I thought that might help."

Defendant's adult son, a college student, lived with the parties during the holidays and in the summer; for that son plaintiff purchased minor items of wearing apparel and at one Christmas topcoats and slacks. Defendant's minor son had dinner with the parties about one night a week. Although the minor son lived with his mother, plaintiff prepared a room for him at her own expense if he should decide to live with the parties. Plaintiff paid $134 for family Blue Cross coverage and $90 per year for "family type insurance to cover" defendant's minor son.

Defendant estimated that in his construction business in 1963 he made about $4000. He testified that he kept very busy in his contracting business up until the last of October or November 1964; then business began to drop off, but he picked up a

"little work through the winter". In February or March of 1965 "I went back to work and worked until about the middle of July". From his construction business he grossed $4500 in 1964. In the year 1965 his income was approximately $2000 which included both profit from the construction business and wages as a carpenter. At the time of trial defendant was making approximately $600 per month as a carpenter. During the year 1964 defendant completed a construction job for which he was to be paid $3200; only $800 had been paid. At the time of trial an action was pending for the balance owing thereon.

Prior to the marriage of the parties, defendant's bank account had been garnished by his first wife for failure to make child support payments, a fact of which plaintiff was well informed. In order to enable defendant to carry on his construction business, plaintiff made the first advance to him in the amount of $1000. The garnished account was released about six months afterward and yielded $700. The first wife of defendant has filed an affidavit stating that defendant is $2500 delinquent in the making of support payments for the minor child, a charge which defendant admits to be true. Plaintiff knew that defendant was having difficulty in collecting some of the bills owed him. The European trip of the parties was taken wholly upon the initiative of plaintiff and with the understanding that, owing to the straitened financial condition of defendant, the expense thereof would have to be borne by plaintiff.

Defendant denied that, without explanation, he ever left the company of guests in the home. He stated that he never refused to work "when the work was available". He had no recollection of discussing his construction business with plaintiff before marriage. The only occasion upon which he was displeased over Mr. or Mrs. W was when his wife was invited to some affair without him; his wife gave an excuse for the failure to invite him and he took exception to it. He was always pleasant to Mr. and Mrs. H. He had no objection to his wife having a cocktail before dinner, but upon one occasion she objected if he did not drink along with her. If plaintiff went for a ride with him on Sunday afternoon at his request, she was "unpleasant to me so after the first few requests I stopped making them". Defendant's only friends who came to visit at the home were relatives, and he visited only with relatives in their home.

> "Q. What was your attitude with respect to supporting her?
>
> A. I thought that I had agreed to pay her a certain amount and when it became impossible for me to do this I felt very badly about it. I was never used to having someone support me. I was always used to supporting myself."

He never told plaintiff that he didn't enjoy her friends and that he didn't want to become involved or in contact with them.

Defendant attacks plaintiff's evidence as consisting only of bald statements of conclusions and hence having no probative value. A careful review of the transcript does not support that assault. Specific instances of defendant's conduct are recited in the testimony. Wherever plaintiff generalized as to defendant's conduct and attitudes, her generalizations were by and large consonant with and supported by those specific instances. Words descriptive of an attitude and which have a well understood meaning need not be broken down into their component parts as evidenced by a dictionary in order to have probative value when applied to a particular event. In the context in which we find them here, we believe that "sulkiness", "protest", "resentment", are understandably descriptive of conduct without further elaboration.

The trial court's award of a divorce to plaintiff clearly shows its acceptance of the testimony adduced in plaintiff's behalf. While this Court must review such a case upon the whole record, "* * * we

will consider the better vantage point of the trial court to assess the credibility of the witness and to observe the intangible factors which do not make themselves so apparent to us in the cold, written record. The findings of the trial court should be deferred to unless they are in such conflict with a clear preponderance of the evidence as to disclose a manifest abuse of judicial discretion." Crowley v. Crowley, Mo.App., 360 S.W.2d 293, 297. And see Mayor v. Mayor, Mo.App., 351 S.W.2d 810, 813; Spencer v. Spencer, Mo.App., 382 S.W.2d 237, 240.

The prevalent social philosophy underlying such a divorce statute as ours was long since expressed in Barth v. Barth, 168 Mo.App. 423, 151 S.W. 769, 770–771: "When it becomes apparent that the true aims of the union of a man and a woman can no longer be achieved by continuing the marital tie, it can hardly be that the interests of society demand that the union be preserved by mere force of law * * *." We proceed to consider the evidence in the present case in the light of that principle and in conformity with the terms of the statute. In determining whether or not the true aims of the union have been rendered impossible of achievement the inquiry has frequently been stated in terms of the subversion of the family relation and it has been said that in order for acts or conduct to reach the level of statutory indignities they must be such as to make the complainant's condition so intolerable as to destroy the true family relation. Mayor v. Mayor, supra; Spencer v. Spencer, supra; Ames v. Ames, Mo.App., 284 S.W.2d 888; Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426.

If one could be only a casual reader of the record in this case that which would impinge most strongly on one's consciousness would be the fact that defendant made no contribution to the maintenance of the household or to the support of his wife. While it has been held that non-support is not made a ground of divorce under our statute, Hess v. Hess, 232 Mo.App. 825, 113 S.W.2d 139, the decided cases do not negative the propriety of considering non-support along with other evidence in making a determination of whether the statutory requirement of indignities has been satisfied. Lowe v. Lowe, Mo.App., 229 S.W.2d 7, 13. Its pertinency cannot be doubted. But here we do not have merely the fact of defendant's non-support of his wife; we find the aggravated fact that the wife has been forced into the position of supporting her husband. Not that the wife expected to be fully supported by the husband; we think it clear that plaintiff intended to continue her control over her prior acquired assets and necessarily to bear the burden of their maintenance and that she intended to provide a residence for the parties with all its amenities. However the premarital arrangements of the parties indicate her expectation that she would have the cooperation of defendant in the furnishing of the family table and in bearing the burden of other routine household expenses. In this expectation she was completely disappointed. In short order she found herself in a situation where it was necessary that she support her husband if the marital relationship was to continue. It was not the situation where a married woman is confronted with a duty to sustain the burden of an ailing or disabled husband; there is sufficient evidence to justify the conclusion that the defendant's failure to bear his contemplated share of the load could be attributed to his lack of initiative, industry and ambition. Plaintiff was generous to a fault and it might reasonably be inferred that defendant was content to rely upon her generosity.

Plaintiff's reward was the creation of an atmosphere of suspicion and mistrust of her, a condition for which the record discloses no justification. Her performance of her professional duties was cast in doubt. Her long standing business and professional relations with men were made the subject of veiled insinuations while the

social companionship of old friends which she had long enjoyed became more and more constricted as a result of the unsocial and impolite demeanor of the defendant. The depressing effect of the repeated sulkiness of an actor is not a fabricated figure of the imagination, for, as human experience shows, such contrived gloomy silence, like the nimbus, molds a canopy of uniform sombre grayness over the observer, naturally inducing depression. The association of two persons under such conditions bespeaks not companionship but benumbed dejection. In the entirety of such conduct of the defendant a species of mental cruelty is found; whether such conduct was deliberate or attributable merely to the insensitivity of defendant, it existed as a fact. Under such conditions it is impossible to see how those prime requisites of the proper maintenance of the marriage relation—congenial and harmonious companionship, mutual trust, sympathy, and reciprocal respect—can be attained.

The plaintiff was clearly the innocent party and we cannot say that the trial court erred in granting her a divorce.

The allowance of attorneys' fees to the plaintiff must be disapproved. The record establishes incontrovertibly the ample means of the plaintiff to prosecute her suit. Her current financial status is much superior to that of defendant whether considered from the standpoint of income or of obligations or of ability to pursue a gainful occupation. "* * * if a wife is possessed of sufficient means of her own to prosecute a divorce suit, then there is no reason for requiring the husband to finance her side of the litigation." McKenzie v. McKenzie, Mo.App., 306 S.W.2d 588, 592; Baer v. Baer, Mo.App., 51 S.W.2d 873.

The judgment is reversed and the cause remanded with directions to the Circuit Court of St. Louis County to enter judgment granting a divorce to plaintiff without the allowance of attorneys' fees.

PER CURIAM.

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, the judgment is reversed and the cause remanded with directions to the Circuit Court of St. Louis County to enter judgment granting a divorce to plaintiff without the allowance of attorneys' fees.

ANDERSON, P. J., WOLFE, J., and GEORGE W. CLOYD, Special Judge, concur.