Lowell R. MOORE, Plaintiff-Respondent,

v.

Minnie MOORE, Defendant-Appellant.

No. 7821.

Springfield Court of Appeals.

Missouri.

Aug. 24, 1960.

Chinn & White, Turner White, III, and Arch M. Skelton, Springfield, for defendant-appellant.

Moore, Pettit & Steinle, J. Hal Moore, Aurora, for plaintiff-respondent.

RUARK, Judge.

On the evening of November 18, 1958, what had apparently been a successful marriage exploded in the presence of neighbor friends when the husband, having discovered that his wife had failed to make a telephone call which he had requested her to make, announced that "I just want my soul back. I want my freedom." His explanation to an attempted peacemaker neighbor who was present at the time was that he wanted to be his own boss.

Later he sought this recovery of soul and freedom by filing a petition for divorce based on "general indignities." To his petition defendant filed answer and cross bill. During trial of the case, however, the defendant announced and testified that she did not want a divorce and that she believed a reconciliation could be effected, and in the argument in this court she renounced any desire for judgment on the cross bill. The judgment of the court granted a divorce on plaintiff's petition, and from that judgment the defendant has appealed.

Plaintiff rests his claim of indignities largely on two things, (a) that his wife was domineering and interfered with his personal and business affairs, and (b) that she indicated a dislike for his relatives and friends and made them feel unwelcome.

Plaintiff and defendant are middle-aged. Both have been married previously. Both have grown children by their former marriages, none by this marriage. They were married on September 16, 1952, and separated on November 18, 1958. Plaintiff hus-

band was (since 1946) and still ·is a rural mail carrier. Defendant had been an "Avon" saleslady and after the marriage continued to work at such employment on a part-time basis. Financially the union was moderately successful. Shortly before the marriage plaintiff had bought, on credit, a farm located near Galena either on or near James River. He said that at the time of marriage he had no money, and he appears to have had little else, except the farm he owed for. Defendant had, at the time of the marriage, a Chevrolet automobile and some money (the amount is in dispute) which went into the furnishing and improvement of the home. During the six years of marriage the parties paid about $3,000 in reduction of the mortgage and purchased another forty acres to add to it (cost $1,800). They remodeled and added to the home; added to the furnishings; redrilled the well and brought water into the house; rebuilt or repaired the barn; rebuilt the fencing; and in general made an attractive place known as "Sky Farm," complete with equipment and machinery, some cattle, riding horses, and, essential to the way of life of people living along James River, a boat and motor.

It is not disputed that defendant's efforts contributed to the prosperity of the parties and that she was a good housekeeper and a hard worker. In addition to her household duties and part-time work as Avon saleslady she sometimes did a man's work with the farm tractor and in taking care of the stock. Plaintiff conceded that she was "a good cook," "a pretty good lover and pretty good wife," "at times, when she wanted to be."

■ But respondent in his brief, in all sincerity, asserts that among the Four Freedoms recognized in Stone County (sometimes referred to as "The Kingdom of the James" because of the James River) are the right of a man to be master in his own house, the right of a man to fish and hunt with his friends at reasonable times without interference from the wife, and the

right to deal and trade in livestock without the wife's intervention. The respondent contended, and here contends, that the defendant was domineering and bossy in interfering with these rights. Running through the whole of plaintiff's testimony and the testimony of a number of his friends is the firm idea that, since the marriage, the plaintiff's old hunting, fishing, swapping (and, shall we say, occasionally imbibing) cronies have gradually come to feel that they are *persona non grata* at Sky Farm. In the words of one of them, the reception they got at the Moore house "sometimes * * * was kinda cool," and of another one, "a little on the cool side, like I wasn't more or less wanted to visit with Lowell." And the occasions of plaintiff's joinder and participation in ·their ventures have probably become fewer as time has passed. Plaintiff and some of his witnesses testify to the effect that defendant was domineering toward the plaintiff. A number of defendant's witnesses, on the other hand, are equally ·firm in the belief that plaintiff *couldn't* be dominated. The sum total of their beliefs concerning him in this respect could be summed up in a good James River word by the expression "bullheaded." Such general characterizations, however, unless accompanied by specific incidents or occurrences, have very little probative value. Bassett v. Bassett, Mo., 280 S.W. 430; Capps v. Capps, Mo. App., 65 S.W.2d 661; Haushalter v. Haushalter, Mo.App., 197 S.W.2d 703, 708. So we will attempt to take the evidence of the claimed indignities item by item. For the sake of clarity we will refer to the parties by their first names, as did most of the witnesses.

*Item—The colt incident:* D. I. Guilliams (or Williams), a farmer, stockman, and motel operator, who testified that prior to Lowell's marriage "we bought cattle, hogs, fished, and hunted together," and who characterized his freeborn independence by stating that "I drink when I like," said that he had been drinking on occasions when he visited the Moore farm but that he was

never drunk or "out of the way" on those occasions, and virtuously affirmed that since the marriage neither he nor Lowell had *been drunk when out together.* He went to the Moore home one afternoon to see about a colt which he was buying or trading for from Lowell. Evidently Lowell was gone, but Minnie was there. Guilliams says he was "not drunk but drinking" on that occasion. (Minnie says he was drunk.) She told him she wasn't going to let the colt go, or words to that effect. The witness said, "I would have traded. I wasn't supposed to be trading with Mrs. Moore."

*Item—The turkey shoot:* In the fall of *1954* Guilliams and Lowell were going to a turkey shoot at Crane (on Flat Creek). "Lowell and I stopped at Jake Watts' store down here, and his wife drove up, and was opposed to him going to this turkey shoot, and said, 'I married you to be with me, and I intend for you to stay with me.' And she told him that he wasn't going to the turkey shoot, and she made a few slaps at him, and embarrassed him very much; me, also—" The witness said, however, that Lowell went on to the turkey shoot. He doesn't think he had been drinking on that occasion but he didn't remember.

We find nothing in Lowell's testimony concerning the turkey shoot. Minnie's version is that it didn't happen. She says that what happened was that, after she and Lowell had been married about three weeks, Guilliams came over to the place with a fifth of whisky and the two of them (Lowell and Guilliams) sat out in the yard and drank awhile and then left; that she was a stranger and scared, and when Lowell failed to return by 9:00 she went hunting for him. She found the two "at this end of the bridge—sitting there drinking." She says she urged Lowell to come home, and that Mr. Guilliams observed, "You know, that is funny about you women. My wife just left here. She has been hunting me too." Lowell came home "when he got ready," but afterwards apologized.

*Item—The houseboat incident:* The same witness, Guilliams, tells it: "My brother and I dropped by, and Lowell agreed to go down to the houseboat and fish, and just visit. We hadn't been together for some time. * * * Well, she wanted to go along, and she agreed to get out at Branson and stay with her sister. And when we got to Branson, why, she didn't want to get out, she went on down to the houseboat with us." He said this happened in 1954. Minnie said this incident was also shortly after she and her husband were married (in 1952). She admits she did not get out at Branson and did go along on the houseboat but that "it was after dark. They weren't fishing. They didn't go to fish."

*Item—Another anti-fishing incident* ("a good long time ago"): Doc Young and witness Sheriff Walker came by to get Lowell to go fishing. "And we had the boat loaded up, and ready to go, and directly Lowell went out to the car, and got in and shut the car door, and said, 'Let's go, let's go.' And about that time Stevie [Minnie] run up there and grabbed the door, and the handle, and begin to hollering at Lowell. And of course, I couldn't say just what everything was that was said, but there was quite a commotion there, and—* * * I just don't know all the words that was said, but there was quite a loud commotion going on, and finally, she told him that if he went on with us that she wouldn't be there whenever he got back. And of course he kept telling Doctor and I to drive on, and finally, the doctor drove on off and left her." Note Lowell went on fishing.

*Item—Late return from Shrine parade:* Lowell and his witness Walker usually rode horses in the Shrine parade at Springfield. On one such occasion they did not return until 2:00 or 2:30 a. m. Minnie came in while they were unloading (the implication is that she had been out looking for Lowell) and she was "awfully mad, upset about his being out * * * so late."

This friend said that on two or three occasions he went after Lowell's registered

five-gaited stallion to take him around different places "to kindly show him off" for advertising purposes, but that he discontinued this practice because he could see Minnie "didn't care about it."

*Item—Insistence on putting farm in defendant's name:* Lowell said that Minnie was insistent on his putting the title to Sky Farm in both their names because she was afraid "my kids would throw her off, if anything happened to me, and she would be set out in the cold," and finally, *in 1953,* he acceded to her demands because he "had rather do it than listen to it." After that she "started being more domineering."

*Item—Refusal to sell or mortgage the home:* Lowell was offered the chance to go into a Table Rock lake shore property development. Minnie refused to join in mortgaging the home in order to raise the necessary $10,000. Admittedly this was a speculative proposition, and it is doubtful that Lowell himself would have gone through with it. In a letter written to his stepdaughter he said the offer "might be a fleece job" and expressed some doubt concerning the proposition. In another letter he said he was "bowing out" because his proposed partner had promised a real estate dealer ten per cent instead of five per cent for sale of lots.

On what may or may not have been another occasion Lowell said that he wanted to sell Sky Farm and move to town, and according to Lowell they had an interested prospective buyer, but Minnie, without his knowledge, removed the property from the real estate listing.

*Item—Criticism of trades:* Lowell said that his wife refused to sign notes "on some of my stupid trades." He said that she criticized most of his cattle trades, and when he would buy a cow on his mail route he usually "got the devil about it" when he got home. But he bought the cows anyway. One of his witnesses (Gladys Hicks) said Minnie told her Lowell was always making stupid trades. Lowell's stepmother testified Minnie said he "wasn't any business man,"

that he was a good worker, but "didn't know how to handle his money, or do business, and if it hadn't been for her they wouldn't have had anything." Minnie denies she made any of these statements.

*Item—The pasture incident:* Lowell's brother brought four or five short yearlings to Sky Farm for pasturing. Lowell said they had plenty of pasture, but that Minnie complained they did not have enough pasture for their own cattle, and the brother moved his calves off.

*Item—The cow sales incidents:* Raymond Clines said he went to the place "last spring" (1958 or 1959) and made a deal with Lowell to buy a cow but that Minnie objected and prevented the deal. The witness said Minnie claimed the cow was hers. Although the two were partners and equal owners in cattle ownership (Lowell admits this), Minnie did claim one cow (Mitzie) as her own, and there was the incident of the sale of Mitzie (whether this was the same cow involved in the Clines incident we do not know). Minnie says that Lowell sold Mitzie to a Mr. Cale for $150, whereas she had been offered $250 for her. Minnie claimed Mitzie as her own because "I had raised her from a tiny little calf," "because I just felt like I wanted to sort of mother it. And he said, 'You can have little calf Mitzie.' And I raised her from a little calf."

*Item—*Lowell says Minnie picked out his clothes, that she chose the pants and shirts he wore. He did not testify that those she chose for him were unsuitable or unsatisfactory to him, or how many times she bought clothes for him, or whether he was prevented from buying what he wanted, or what steps he had taken to prevent her from doing this shopping.

*Item—The butchering incident:* Lowell proposed to butcher a steer and give the meat to his children. He says Minnie objected to this, although he had previously butchered and given meat to her daughter and son-in-law. We do not find where Minnie denies this, although her evidence is to the effect that meat was given to her

children for a Christmas present because shortly before, for his birthday, they had given him (Lowell) a television set.

*Item*—Lowell says that Minnie made it disagreeable for his children to visit and at one time threatened (to him) not to cook for them anymore. Plaintiff's witness Gladys Hicks, who said that she and her husband had fished and deer hunted with the Moores, testified about an incident when Lowell's daughter Sharon came downstairs in the morning, clad only in what might be called a "negligee," and wanted to go out to the barn to see her father. Minnie forbade her to go out so clothed and made Sharon cry. There is evidence of another occasion when this same daughter was quarreling at Lowell, and Minnie told her in substance either to desist or to take her bag and get out—but note this was in defense of the now complaining plaintiff.

*Item—The quail hunting incident:* This is the incident which probably triggered the blowup. The parties had an old Chevrolet and a comparatively new Plymouth. On Sunday before the separation Lowell left at 4:30 in the morning to go quail hunting. He asked for the keys to the Plymouth. Minnie refused because "you are not hauling that bird dog in the Plymouth" and because she had Avon products in that car. Lowell said he would unload it. Minnie said she would do it herself "when I get ready." With that, plaintiff "told her what to do with the car" and went in the old one.

*Item—The telephone incident:* Minnie's daughter and son-in-law were both employed in Detroit. The evidence, including Lowell's testimony, shows that he was fond of them and had written several letters concerning business opportunities in the Galena neighborhood, including boat dock, tourist court, and television business. Finally they decided to move to Galena and go into the television business. The correspondence indicates that Lowell, if not ac-

tually urging the move, was favorably disposed toward it, whereas Minnie says she was not so favorable because she felt her daughter and son-in-law were used to making more money than was possible in Galena. They quit their jobs and loaded their equipment in trucks. Lowell had written that he would come to Detroit and drive one of the trucks to Galena. The daughter had sent plane tickets and a neighbor had arranged to drive Lowell and Minnie to the airport at Springfield. On Monday after the quail hunting incident above mentioned, Lowell told Minnie to call the children and tell them that he and Minnie were not coming. She did not make the call because, so she says, the next morning he told her *not* to call. This precipitated the declaration of Lowell concerning his freedom. He said her failure to make the call indicated that he couldn't place dependence in what she said.

*Item*—Finally, the witness Gladys Hicks testified that on one occasion Minnie referred to Lowell's folks as "hillbillies."

There are still a number of other incidents which we cannot relate because of the length of this opinion. They are more trivial than those we have heretofore described, but in general they are along the same line. In concluding our statement of the evidence we should say that neither of the parties impugned the morals of the other and both proved to have excellent reputations among their neighbors.

We are cognizant that in passing on cases of this kind it is the practice to give deference to the circuit judge in respect to the credibility of witnesses. Nevertheless, it is our responsibility to review the whole case and reach our own conclusions and render such judgment as should have been given.[1] The question here is, do the acts and transactions which we have described amount to a course of conduct such as to render plaintiff's condition intolerable

1. Scholl v. Scholl, 194 Mo.App. 559, 185 S.W. 762(2) ; Oliver v. Oliver, Mo.App., 325 S.W.2d 33, 38 ; Elliston v. Elliston, Mo.App., 215 S.W.2d 63, 69 ; Politte v. Politte, Mo.App., 230 S.W.2d 142, 148.

(Section 452.010 RSMo 1949, V.A.M.S.)? Each case of this kind must necessarily be judged on its own facts. No "indignities" case is exact precedent for another, and no hard, fast rule can be followed, because the sensitivities of people differ. Richardson v. Richardson, Mo.App., 270 S.W.2d 68; see Hooper v. Hooper, 19 Mo. 355(2); Elliston v. Elliston, Mo.App., 215 S.W.2d 63, 69. "It has long been established as the law that where the action is based on indignities, such indignities, in the statutory sense, must amount to a species of mental or physical cruelty, or of injury accompanied with insult or hatred, and they must be such as cannot be relieved by any exertions of the injured party. Indignities such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act or word, or occasional acts or words, will not suffice. *The course of conduct must be such as to connote settled hate and a plain manifestation of alienation and estrangement.* Indignities are such acts as consist of unmerited contemptuous conduct, or words and acts of one spouse toward the other which manifests contempt, or contumely, incivility or injury accompanied with insult and amounting to a species of cruelty to the mind." (Our emphasis.) Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554, 561. See also Bassett v. Bassett, supra, 280 S.W. 430; Watson v. Watson, Mo.App., 291 S.W.2d 198, 200; Haushalter v. Haushalter, supra, 197 S.W. 2d 703. And the indignities sufficient to sustain a decree of divorce are wrongful acts over a course of time which are of sufficient gravity or magnitude to make plaintiff's life as defendant's spouse intolerable. Coleman v. Coleman, Mo.App., 318 S.W.2d 378, 381.

 Applying the general rule to the present case, we find no settled or continuous course of conduct which indicates hatred, contempt or estrangement, and we find no great injury to have been suffered by the plaintiff. The incidents which he produced are scattered out over more than six years of married life. Some of the instances of insistence upon going fishing with him occurred shortly after the marriage, and we believe that it is not unusual for a bride of short duration to insist upon her husband's presence and company at that time. Plaintiff himself said Minnie was a "pretty good lover." One instance in which she made an unladylike objection to his going fishing with his friends is not dated, except that it was "a good long time ago." We will agree with respondent in his definition of Stone County freedoms that a husband has a *right* to go fishing. And we will go further and say that this *right* extends to fishing without the constant and ever-present impediment of female presence and participation, if such be against the will of the husband. It is a wise wife who accords her husband that freedom—in moderation—and a foolish wife who interferes. The studied, constant, and repeated interference with that *right* over a long period of time could be, under certain conditions, an indignity, but two or three or four isolated instances of insistence upon going along, or insistence upon his not going (either fishing or turkey shooting), over a period of six years do not, in and of themselves, constitute a constant and studied course of conduct amounting to indignities which render life intolerable. Further, the record convinces us that the plaintiff did, with and without his wife's consent or presence, indulge in a fair amount of fishing, hunting and swapping.

As to plaintiff's charge of domination in financial affairs: We think it was not unusual or unseemly that defendant was insistent upon conveyance of the (then mortgaged) farm into joint title. She was putting her work and money into the venture, and we see no reason why she should not have insisted upon the record title evidencing her interest, especially in view of the plaintiff's trading proclivities. Plaintiff himself agrees that they were partners in the operation of the farm business. Neither can we say that defendant was unjustified in being unwilling to sell or mortgage the farm home to finance his proposed essay into a speculative venture.

■ .Concerning the accusation and criticism in respect to "stupid trades": As to whether Lowell's trades were stupid we cannot say, but the evidence is, by his own statement, that he was not affluent before the marriage, and further, by his admission, he and Minnie were joint owners and "partners over there and in business together. What I owed she owed, didn't she?" Being an equal partner, she was entitled to exercise some rights of a partner in respect to partnership property. It is probable that repeated and constant harping and criticism of every act and endeavor in respect to trading could become extremely wearisome and distasteful and ultimately one form of "indignities." We are inclined to believe that Minnie did, from time to time, assume a critical, or at least an impolitic, attitude in respect to Lowell's trading and swapping activities, but we are likewise inclined to believe that some of her criticism was justified and that Lowell exaggerates when he would have it appear that it was constant. There is an old saying that criticism hurts the most when it is true. And we note he *did* continue to trade.

The accusation that Minnie made it disagreeable for Lowell's children to visit is not borne out by the evidence. The children *did* frequently visit and vacation at Sky Farm, and the evidence indicates that they *did* enjoy themselves and she *did* cook for them, along with her other chores and duties. We can find no place where she communicated any expression of ill will to plaintiff's children, and we note that neither of his children testified against her.

As to the incident concerning her having made his daughter, Sharon, cry because she forbade Sharon to go out in her negligee, we can only say that even in the pleasant and relaxed atmosphere of our clean, forthright Ozarks it is not customary for grown women (Sharon was twenty) to run around outdoors, in the daytime, in their nightgowns. We do not find that the restriction on the daughter was unreasonable.

We are satisfied that the defendant did, with only the best of intentions, attempt to channel her husband's activities into courses which she thought were best for the marriage and best for him, but that in so doing she adopted a course of conduct and attitude which occasionally tended to have a "smothering" effect on plaintiff. It is a close question and one subject to human frailties of judgment as to whether this smothering reached the degree which amounts to the "indignities" as defined by the case law heretofore stated. The defendant probably, but understandably, preferred that the plaintiff spend his time with her, or in useful or profitable occupation, rather than with his fishing-hunting-swapping-horseriding companions, and we deduce that she probably was afraid of his trades. No doubt she desired to direct him toward (what she considered to be) "a better life," and she no doubt found it difficult to compromise her sense of what was best with any great understanding or comprehension of what her husband's views, habits, and masculine desires might demand. To use a Southern Missouri expression, she wanted to tie the stake rope a little too short. But all this was without conscious desire to dominate or oppress and was with the love which promotes the complete desire to do that which was best for her husband. The trouble arose because she perhaps failed to take into account that her husband had, and was entitled to have, ideas of his own on these subjects. We are convinced that he manfully and patiently (or so he thought) submerged his somewhat unconscious desire to pull up the stake until finally the pressure proved overpowering and he "blew up." It was not wholly the fault of either one and neither of them was entirely innocent.

■ In respect to plaintiff's evidence that Minnie once referred to relatives of the. plaintiff as hillbillies: We suggest

that to refer to a person as a "hillbilly," or any other name, for that matter, might or might not be an insult, depending upon the meaning intended to be conveyed, the manner of utterance, and the place where the words are spoken. Webster's New International Dictionary says that a hillbilly is "a backwoodsman or mountaineer of the southern United States;—often used contemptuously." But without the added implication or inflection which indicates an intention to belittle, we would say that, here in Southern Missouri, the term is often given and accepted as a complimentary expression. An Ozark hillbilly is an individual who has learned the real luxury of doing without the entangling complications of *things* which the dependent and over-pressured city dweller is required to consider as necessities. The hillbilly foregoes the hard grandeur of high buildings and canyon streets in exchange for wooded hills and verdant valleys. In place of creeping traffic he accepts the rippling flow of the wandering stream. He does not hear the snarl of exhaust, the raucous braying of horns, and the sharp, strident babble of many tense voices. For him instead is the measured beat of the katydid, the lonesome, far-off complaining of the whippoorwill, perhaps even the sound of a falling acorn in the infinite peace of the quiet woods. The hillbilly is often not familiar with new models, soirees, and office politics. But he does have the time and surroundings conducive to sober reflection and honest thought, the opportunity to get closer to his God. No, in Southern Missouri the appellation "hill-billy" is not generally an insult or an indignity; it is an expression of envy.

We are of the opinion that the indignities complained of were too scattered and remote, and, in general, too inconsequential, to be termed a continuous or studied course of conduct amounting to a species of cruelty, injury, insult, contempt, settled hatred or estrangement. Practically all marriages have their moments of discord. Few run their course without some occasional "indignity" offered and suffered. Most marriage ceremonies take that into account when the parties promise to take each other for better or worse. Occasional exhibition of traits which offend the other is a part of the "worse," but it is not the intolerable indignities contemplated by the statute.

Appellant's second contention is that, because of certain acts and conduct on the part of the plaintiff, he was not the innocent and injured party and was therefore not entitled to a decree. Since we have held the plaintiff did not prove sufficient indignities to entitle him to a divorce, and since the cross bill has been abandoned, we see no reason to consider such alleged acts and it would be of no service to the parties to this already crippled marriage to spread them upon the published record. It is our judgment that the divorce should be denied and the whole cause dismissed. It is so ordered.

STONE, P. J., concurs.

McDOWELL, J., not sitting.