**Nina SPAINHOWER, Plaintiff-Respondent,**

**v.**

**Lloyd SPAINHOWER, Defendant-Appellant.**

**No. 33163.**

St. Louis Court of Appeals.

Missouri.

May 20, 1969.

William J. Becker, Clayton, for appellant.

Carter, Fitzsimmons & Brinker, Clayton, for respondent.

PER CURIAM.

Divorce action in which plaintiff wife founded her claim upon general indignities specifying, among other things, that defendant cursed and swore at plaintiff, frequently struck her; that during their marriage defendant frequently stayed out all night and refused any explanation of where he had been; that defendant frequently told plaintiff to get out of the house, told her that he did not love her, did not want to live with her, refused to support her adequately; that throughout their marriage defendant frequently came home in an inebriated condition; and that thereby her condition was rendered intolerable. Defendant filed his cross-bill, also alleging indignities. The trial court awarded a divorce to plaintiff, together with $60 per week alimony, $625 for attorney's fees and costs.

The parties were married in March 1938 and except for a brief period when defendant was in flight training, lived together continuously as husband and wife until plaintiff left the family home in August, 1966. When defendant left the Service in 1942 the parties returned to St. Louis and moved into an apartment on Washington Avenue with plaintiff's mother, plaintiff's two sisters, Winifred and Hortense, and plaintiff's brother and his wife. The husband of one of the sisters lived in the apartment also when he was in the City. Plaintiff's brother and wife moved from the apartment in a short time. Plaintiff's mother died in 1957.

In 1960 the family moved into a four-bedroom house on Westminster in St. Louis, on which the defendant made a down payment of $1500. According to plaintiff it was defendant's idea that "all would live together". At this time the family group consisted of defendant's

mother (who stayed only two weeks), plaintiff's two named sisters (and the husband of one) and the present plaintiff and defendant. Upon moving into the house on Westminster defendant asked plaintiff's sister Winifred to handle all the finances in connection with the place. Under that arrangement he agreed to pay the sister $60.00 per week, which was to be used for payments on the house, upkeep, utilities and food. In addition he gave plaintiff $20.00 per week. The total of $80.00 per week was not sufficient to cover all the expenses of the house and the balance was made up by the contributions of plaintiff's two sisters. The defendant was sometimes irregular in making the $60.00 payment and upon such occasions when he did not pay in full any deficit was made up by sister Winifred.

In the last few years before the separation defendant's regular working hours as a newspaper photographer were from two-thirty in the afternoon to ten or ten-thirty in the evening; although there were occasions when he would be called out much earlier in the day.

The defendant's laundry was done by the plaintiff and one of her sisters. Meals were prepared by sister Hortense. Owing to his hours of employment the family did not eat meals together regularly but there was always something prepared for the defendant's dinner and left for him in the refrigerator at home.

Plaintiff's testimony as to defendant's conduct is hereinafter stated in the chronological order of the events described:

Both plaintiff and her niece by marriage, Mrs. Clark, testified as to the earliest incident stated in the record, which occurred "about 1960" when plaintiff and defendant were scheduled to go out for the evening together. Upon this occasion the defendant arrived home three hours late and very inebriated. Plaintiff was ready to go out. However defendant went to bed and slept for a time. When he came down he insisted on going out but plaintiff refused to

go with him while in such a condition. Thereupon defendant attacked plaintiff while the latter was on a divan. The niece testified that defendant was trying to choke plaintiff. "He more or less had one of his knees in her stomach and was slapping around at her face and choking her, and the two of us couldn't pull him off. Q. You and who else? A. Hortense. Q. You tried to pull him away? A. And he knocked me back into the floor * * *. My [sick] husband heard it and got up and came down and pulled him off."

Prior to the two-year period before separation, plaintiff never knew when defendant would get home, and when he came home late in the mornings "—lots of times six o'clock in the morning—" he would stumble up the steps and sometimes could not make it up the stairs. Upon such occasions he would lie on the divan at the living room level and sleep there. This kind of thing occurred two or three times a month in that period and became more frequent within the last two years before separation.

At two years prior to separation defendant used vulgar language and cursed and swore at the plaintiff.

"Q. Would you tell the court when or how often this occurred? A. Mostly when he came home at nights when he had been drinking.

Q. How often or how frequently?

A. Two or three times a week.

Q. Would you tell us what words or language he'd use?

A. I would be sound asleep and he would come home, be drinking, and he'd call me a bitch; and I was home in bed.

* * * * * *

Q. And when he'd come home that way, he'd use this language to you?

A. Yes, sir.

Q. What other words or language did he use to you besides calling you the bitch that you mentioned?

A. Mostly that, but then he would tell me to get out and find a good lawyer, because he was going to take bankruptcy and burn the house down, for me to get out."

Plaintiff was asked how often her husband struck or hit her or did something physically to her in the last year before they separated and she answered, "Oh, possibly five or six times".

"Q. What did he do on those occasions, would you describe that?

A. He'd grab me around my neck and hold my hand and rub my nose all over my face.

Q. Is this usually what he did, the same thing each time?

A. I have had black eyes before that.

Q. How many times have you had black eyes?

A. About four.

Q. In the last two years. Did you have other portions of your—

A. Yes.

Q. What kind of marks?

A. Mostly my nose was black and blue and I'd have blue marks on my neck."

*   *   *   *   *   *

Q. * * * did you ever fight with him and strike him?

A. I fought back.

Q. Did you ever initiate or start any fights or striking him?

A. No.

Q. What would you do when he'd push your nose in?

A. I'd try to get away from him and I'd scratch him.

Q. Now, what effect, if any, did this have on your nerves or your health, Mrs. Spainhower, his coming home and drinking and cursing and fighting with you?

A. Well, it had the effect that I had to have an ulcer operation.

*   *   *   *   *   *

Q. What is the condition of your nerves now?

A. Not very good.

Q. Are you under a doctor's care?

A. I have been, yes."

Plaintiff's sister Winifred testified that she was well aware that defendant had a drinking problem, that on numerous occasions when he came home he couldn't get up the stairs. At such times he would sleep on the living room floor or on the divan located there; the last year before the separation was the worst in that regard. She heard plaintiff and defendant quarreling and arguing upon numerous occasions but she became involved only once; she estimated that she had heard the plaintiff screaming upon at least twenty-five occasions over a period of five years. About three or four months before separation, when she heard plaintiff scream for help, she and her sister went to the door of defendant's bedroom and told defendant that if he hit plaintiff again she would call the police. While she never directly witnessed any physical encounter between the two she saw the evidence of injury in marks on plaintiff's throat, eyes and nose many times —"Black and blue marks, and her nose would be all swollen out of shape." In overhearing quarrels between the parties, she heard defendant call plaintiff a bitch time after time, and "Get out of the house, you bitch, and take your sisters with you." Defendant never asked the sisters directly to leave, although plaintiff asked him, "If you want them to leave, why don't you tell them, Lloyd"? The witness said that on several occasions she and sister Hortense asked of defendant, "Do you want us to

leave, Lloyd? Can you get along better, you and Nina? You're not getting along well now." His last response, made in the presence of plaintiff, was that "I will not live with her another day if you leave." Winifred's suggestion about moving out was made repeatedly over the last two years before separation.

When asked what brought her to the final conclusion to move out of the family residence, plaintiff answered: "Because he came home night after night and asked me, 'Have you seen a lawyer? You better get a divorce. I'm going to take bankruptcy or burn the house down. I want you out of here'. And I couldn't take it any longer."

Pressed to fix the time when she reached the decision to move, she answered, "Well, it was in the back of my mind because he kept nagging me to get out and see a good lawyer, calling me terrible names." Plaintiff told defendant a week or two before they moved out that she and her sisters were leaving. Thereafter when defendant came in one morning and asked what was going on, plaintiff answered, "You told me to leave and I'm leaving." Whereupon defendant said, "Well, you know this will be the end of us", and plaintiff replied, "Yes, I know it will be." Four days before actually leaving the house plaintiff moved out of defendant's bedroom and slept on a twin-bed in Winifred's room. On the morning of the day of departure defendant had gotten up and taken leave of the house, at which time the household rugs were already rolled up ready for moving and all plaintiff's clothes were out of the closet.

Sister Winifred explained that defendant's repetition of the order to plaintiff to get out of the house and "take your sisters with you" caused her and sister Hortense to decide that they would move and so "we looked for a small apartment, efficiency, she and I. * * * And Nina said, if we left, she would have to leave, too; couldn't

put up with that treatment any longer. * * * She moved with us." Plaintiff stated: "* * * they [her sisters] were going to move, and I asked if I may move with them. I had no place else to go."

Plaintiff has not been gainfully employed since 1940. She has no assets other than a 1956 Chevrolet which was willed to her by a brother-in-law.

Defendant's evidence disclosed that at some time in 1958 he suffered an injury to a leg, the nature of which is not further shown in the record. Over objection there was admitted an X-ray negative which defendant identified as having been made of his leg on November 18, 1958, when he was present and conscious—that he saw it made, that he was with his physician and a technician when the negative was made, that he got off the table and followed the technician into the developing room, "because they wanted to show me their developing room and developing equipment. I have done some medical photography. I'm not entirely dumb about it." The doctor gave defendant the X-ray within two or three days and in a short time thereafter, from the X-ray, the defendant made a positive print, which was also admitted in evidence. What follows constitutes the whole of the other evidence relating to the original injury to defendant's leg, to any treatments therefor, to operations and to the present condition of the leg:

"Q. Now then, I will refer you again to Exhibit B, [the positive print] and particularly, to the brace built into your leg, and ask you to hold it up and show the Judge and counsel * * * what has happened to that brace between 1958 and today, what condition it is in now, to your own knowledge.

A. The brace in my leg was re-broken when I was injured on my job, and. I underwent a second operation to have that repaired and to have the brace in my hip bolstered.

Q. Is there a break existing in it to-day?

A. Yes, sir.

Q. Would you show that to the Judge?

A. I don't have the X-ray on that, the brace in my hip. I was injured and it was broken and I haven't been re-operated on since then.

Q. And you are walking today with that broken brace in your hip? A. Yes, sir.

Q. And in the business of moving around on public assignments in the photography field?

A. Yes, sir."

Defendant characterized the activity of a newspaper photographer as a continuous fatiguing job during which he would always be carrying some amount of heavy equipment. He then proceeded to explain that there had been occasions during the last five years in which he would sleep on a sofa downstairs after coming home from the day's work; this he did rather than climb to the second floor bedroom and thereby disturb the household—"In fact I seldom slept on the sofa and would rather sleep flat on the floor, flat on the back on the floor for comfort. * * *´ It was more restful, because it held me in better shape." He had done so dozens of times, depending upon how hard he had been working. Never had he so lain down due to over-indulgence in liquor. "I don't drink that much." "Q. It was due to the causes you explain? A. And the drugs I was taking to try to relieve myself. Q. The pain-killer? A. That's right." He attributed any stumble in climbing the stairs to the fact that he wore a ¾-inch lift on a shoe.

Defendant was the only defence witness. In large part his testimony was directly contradictory of that of plaintiff relating to his personal conduct.

"Q. Now, did you ever strike—by that I mean swing your hands or your fist at your wife, Nina Spainhower, at any time in your life?

A. That I want to swear, absolutely no. I would not strike anyone, much less my wife."

He denied ever asking or telling his wife to get out of the house. Whenever an altercation occurred which involved physical contact, the initiative was always taken by plaintiff—"I would have to restrain her from scratching me or biting me or kicking me." On such occasions "One thing I resented very much was being called a son of a bitch. * * * I guess it was one of her favorite phrases."

Sister Winifred had testified that her warning to defendant that she would call the police (as stated above) was made about three months before separation. Defendant testified that there was no such occurrence within three or four months before separation but that there had been one such occasion—"It must have been possibly three or four years ago."

"Q. * * * Did your wife ever have black eyes or eyes that were blackened by any encounter with you?

A. Yes, sir.

Q. How often did that occur?

A. I couldn't say how many times; when I would hold her, or hold my hand over her mouth, perhaps as many as a half-dozen times or more.

Q. And did you ever strike her that made her have a black eye?

A. No, sir. I definitely did not strike her.

Q. When you would hold her mouth, was it at a time when she was using vulgar language?

A. Yes, sir, beneath her dignity."

\* \* \* \* \* \*

"Q. And I believe you said on about—your recollection is that on about six occasions, from the way you had handled or touched your wife, she ended up with black eyes?

A. She ended up with a swollen nose and her eyes would be black, or dark underneath, yes.

Q. This wasn't because you struck her?

A. That's right.

Q. Because you were holding her mouth shut, and this blackened her eyes? You held her mouth and nose shut?

A. Yes, sir."

Identifying a letter-opener, defendant testified: "I would say perhaps as much as a year before Nina left me, I had to wrest this letter-opener from her because she threatened me with it, threatened to stab me with it, in fact was attempting to stab me with it." "Q. Where did this occur? What room in the house. A. It occurred in our bedroom. Q. Were you in the process of getting ready for bed? A. I was ready for bed. Q. And you recall what brought about this altercation, what she said or did? A. Perhaps berating me for being home late, and perhaps arguing because I owed her money. Q. Now, what did you do to restrain her all that time? A. Well, I had to hold both of her wrists very tightly to try to get it away from her, and actually with my physical condition, we tripped, and actually were in a corner of the room in a huddle while I managed to get this from her. Q. And did you get it away from her? A. Yes, sir. Q. And that was the last of several such instances? A. I believe so. \* \* \* Q. Now, Mrs. Charlotte Clark has testified to an incident when she saw a physical encounter between you and your wife. Did she witness one of those? A. Yes, she did. Q. And was that encounter such as she described?

First of all, was it on the first floor? A. No, sir. Q. Where did it occur? A. In our bedroom. Q. And was it this last one that you just described to the Court? A. Yes, sir. Q. Did she come in and help to separate you? A. She and her two sisters, both. Q. She and—. A. Winifred and Hortense. Q. Your two sister-in-laws? A. Yes. Q. So they all came into the bedroom at that time? A. Yes, sir."

The appellant charges that the evidence offered by the plaintiff failed to establish actionable "indignities" within the meaning of the statute.

That the statute does not by its own terms establish the criteria by which to determine whether indignities have been suffered and, if so, by which to determine whether the victim's condition has been rendered intolerable is self-evident. Accordingly, where a plaintiff seeks a divorce on the ground of indignities, each such case must be decided upon its own facts. Schwarz v. Schwarz, Mo.App., 427 S.W. 2d 734; Richardson v. Richardson, Mo. App., 270 S.W.2d 68; Kinder v. Kinder, Mo.App., 267 S.W.2d 356; Moore v. Moore, Mo.App., 337 S.W.2d 781. The action addresses itself to the conscience of the court. Oliver v. Oliver, Mo.App., 325 S.W.2d 33.

In the attempt to formulate some generalized test by which to determine whether a complaining party has suffered a statutory indignity it has been repeatedly stated that the conduct of the offending party must have involved a continuing course of conduct whereby mental or physical cruelty has been visited upon the complaining party. Mayor v. Mayor, Mo. App., 351 S.W.2d 810; Oliver v. Oliver, supra. Illustrative of the mental cruelty aspect of such a test it has been said that indignities are "such acts as consist of unmerited contemptuous conduct, or words and acts of one spouse toward the other which manifest contempt, or contumely, incivility or injury accompanied with insult

and amounting to a species of cruelty to the mind." Moore v. Moore, Mo.App., 337 S.W.2d 781, 787. Cases reviewing "indignities" in the light of the requirement of mental cruelty frequently add the generally redundant qualification that the conduct complained of must be subversive of the family relation. Mayor v. Mayor, supra, at 813; Schwarz v. Schwarz, supra, at 737; J. v. K., Mo.App., 419 S.W.2d 461; Thomas v. Thomas, Mo.App., 288 S.W.2d 689, cert. denied 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77. And see Klamberg v. Klamberg, Mo.App., 428 S.W.2d 889.

■ Appellant maintains that the acts in evidence "did not amount to a species of mental cruelty, or disclose a course of conduct whereby the plaintiff's life has been rendered intolerable, or amount to repeated acts of such character and frequency as to be subversive of the family relation." By this attack defendant is asserting that the evidence does not support the judgment, a position which he may take whether the point was made at trial or not. Sec. 510.310(4), V.A.M.S.

■ While this court reviews the whole of the record and reaches its own independent conclusions it does so with the statutory qualification that it shall give due consideration to the opportunity of the trial court to judge of the credibility of the witnesses. It is plain that in this case the trial court has placed its credence in the testimony of plaintiff's witnesses. Does the plaintiff's evidence disclose a species of mental cruelty perpetrated upon the plaintiff by defendant?

■ Plaintiff's evidence reveals a long continued course of conduct in which defendant cursed her in vulgar language and applied to her the most opprobrious terms. The frequency of his address as "bitch" was corroborated. Apparently the favored time for the use of such language was late at night when defendant returned home, energized thereto, it may be inferred, by the evening's drinking activities. Night after night defendant urged plaintiff to see a lawyer and get a divorce—"I want you out of here * * * and take your sisters with you." Perversely he told the sisters that if they moved out he wouldn't live with plaintiff another day. In such a climate there is no moderating element which would prevent the husband's conduct, in the words of Moore v. Moore, supra, from manifesting "contempt, or contumely * * * accompanied with insult and amounting to a species of cruelty to the mind". Here, to mental cruelty we add the clear evidence of physical cruelty. In all this it is not difficult to find subversion, that is, overthrow or destruction, of the true, the genuine family relation or that the recipient's condition has been rendered intolerable by the conduct of the defendant.

■ Appellant would apparently contend that generalized proof of indignities without specific findings is insufficient to invoke application of the statute. Apparently appellant would require a plaintiff to pinpoint each occurrence of which she makes complaint in her testimony. We think that plaintiff's ascription of such occurrences is sufficiently definite. No doubt can exist as to the type of conduct which she attributed to defendant; her testimony established its detailed elements. She assigned the events to definite periods of time—within two years of separation, within the six months before separation, and three or four months before separation. With the content of an event definite in its details, we perceive no reason why it is not of probative value to set it within a definite period if the period is relevant. Under such circumstances it should not be necessary to pinpoint the exact moment of occurrence. Even if the precise date be not consciously fixed, still the memory lingers on. It should not be necessary to maintain a diary of abuse. We find that plaintiff's evidence was sufficient to support the judgment.

Finally, defendant endeavors to rely on the doctrine of condonation to defeat plaintiff's claim to a divorce.

Condonation means a forgiveness or pardon of a marital offence made after full knowledge of the wrong. Arnold v. Arnold, Mo., 222 S.W. 996; Weber v. Weber, 195 Mo.App. 126, 189 S.W. 577. Whether or not there has been such a forgiveness is a question of fact, the answer to which rests most frequently not in the expressed words of the wronged party but in inferences derived from the other conduct of such a party, an issue more often than not raised by the cohabitation of the wronged party with the offender. In divorce cases, cohabitation is strong evidence of forgiveness "increasing in probative force with * * * the length of time continued * * *. The nature of the conjugal offence has much to do with this question. In cases of adultery condonation from cohabitation is more nearly conclusive than in cases of cruelty or indignities." Weber v. Weber, supra, at p. 578. Indeed it has been held that "Condonation for repeated acts of cruelty and indignities will not be inferred from toleration and association afterwards." Arnold v. Arnold, supra, at p. 999; Chamberlain v. Chamberlain, Mo.App., 230 S.W.2d 184, 190. However, condonation is a conditional forgiveness, the implied condition being that the pardoned offence be not repeated and also that the offender will thereafter "treat the forgiving spouse in all respects with conjugal kindness." Ratcliff v. Ratcliff, 221 Mo.App. 944, 288 S.W. 794, 796. In the event that the condition be violated the original grievance as a cause of divorce is revived although the subsequent act of marital misconduct be different from the original one. O'Neil v. O'Neil, Mo.App., 264 S.W. 61.

It is not necessary to pass upon the question of whether or not forgiveness for offences committed in the remote past is to be inferred from the fact that the parties continued to live as husband and wife after the commission of many indignities. The continued maintenance of the household arrangement might well be attributed to the impecunious condition of plaintiff, to her dependence morally and at least in part financially upon her continued association with her sisters, to patient endurance of deeply resented treatment, to hope of reform, or any combination of them, without thereby conclusively establishing an intent to forgive all past offences. That however is a question upon which we do not pass. If we assume that at some point in the last years of the parties' married life, condonation by plaintiff were to be inferred as a fact the effect thereof would be extinguished by the cruel and contemptuous treatment thereafter received by plaintiff at the hands of defendant. Condonation establishes a certain status for the original wrongdoer—an immunity from divorce—but that status has attached to it a true condition subsequent; if that condition occurs it operates to extinguish the immunity otherwise had. Here the defendant's continuing cruel and contemptuous treatment of plaintiff would, in the words of the precedents, operate to revive the original grounds for divorce. There is ample evidence of such conduct by defendant up to three or four months before separation.

Judgment affirmed.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.